STATE OF ALABAMA
THE CIRCUIT COURT FOR THE COUNTY OF AUTAUGA
NINETEENTH JUDICIAL CIRCUIT
CRIMINAL


STATE OF ALABAMA

          v.                    Case No. CC-99-322
CARL EMMETT WYATT,

          Defendant.
_____/



          REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL



Before:


               Hon. John B. Bush
                  and jury
                    Monday, May 8, 2000,
                    10:58 a.m.




          For the State:

               Samuel Scott Partridge, Esq.
               Assistant District Attorney

               Kenny James,
               Assistant District Attorney

          For the Defendant:

               Robert L. Bowers, Jr., Esq.
               Bowers & Bowers


Carol Fain
Official Court Reporter

```
 1          COURT REPORTER'S INDEX TO TRANSCRIPT

 2

 3                                                      Page

 4   Transcript Order Form -                            1

 5   Testimony:

 6        Jay McMichael-                                8

 7        Michael Burks-                               18

 8        John McDaniel-                               24

 9        Joe Sedinger-                                36

10        Donny Nelson-                                42

11        Adam Wadsworth-                              69

12        Melissa Wadsworth-                           77

13        Thomas Searcy-                               80

14        Clara Joy Marshall-                          81

15        Gregory Wanger-                              87

16        Dr. Edward Foxhall-                          94

17        Ronnie Neal Lipscomb-                        99

18        David Atteberry-                            109

19        Carl Wyatt-                                 115

20     .  Donald Brackin-                             150

21   Jury Charge-                                     156

22   Verdict-                                         171

23   Sentencing-                                      173

24   Reporter's Certificate of Completion-           176

25
```

4

1

2                                     EXHIBITS

3    State's Exhibit 3-                                    33

4    State's Exhibit 4-                                    34

5    State's Exhibit 1-                                    47

6    State's Exhibit 5 and 6-                              48

7    State's Exhibit 7-                                    81

8    State's Exhibit 8-                                    94

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          THE COURT:  It is my understanding that the
 2              State would move to dismiss Count I of
 3              the indictment which would leave intact
 4              Count II which alleges Murder of the
 5              Reckless Type; is that correct;
 6              Mr. Partridge?
 7          MR. PARTRIDGE:  That's correct, Your Honor.
 8          THE COURT:  Any objection from the defense?
 9          MR. BOWERS:  No objection.
10              (The Court called the roll of the jury.)
11          THE COURT:  Ladies and gentlemen, as I
12              indicated, we are going to begin the
13              process of selecting a jury to hear and
14              decide the case of State of Alabama v.
15              Carl Emmett Wyatt.
16              Mr. Wyatt is charged in this case
17              with the offense of Reckless Murder
18              arising out of an incident which
19              allegedly occurred back on June 1 or 2
20              of 1999 out -- off of Alpine Drive which
21              is on the Deatsville route.  If I
22              remember it is over there around the
23              county line, if I have the right area in
24              my head, involving the death of a Herman
25              Searcy.
```

```
 1                    (Voir dire of prospective jurors by

 2                    the Court and counsel.)

 3                    (Jury struck between clerk and

 4                    counsel without the presence of the

 5                    court reporter.)

 6          THE COURT:  Ladies and gentlemen, as I call

 7                    your name if you will please come have a

 8                    seat in the jury box over here.  You

 9                    will be the jury that will hear and

10                    decide the case of State of Alabama v.

11                    Carl Wyatt.

12                         Clark Adams, Tommy Ashworth, Carol

13                    Attaway, Robbin Barnes, Kristine Blair,

14                    Ann Boutwell, Kerry Causby, Albert

15                    Caver, Regina Chavez, Glenda Conger,

16                    Mickey Cothran, Mary Cotton, and Will

17                    Jeffcoat.

18                         Ladies and gentlemen, the schedule

19                    is to begin the trial of this case

20                    tomorrow morning at nine o'clock.

21                    (The Court admonished the jury.)

22                    (12:16 p.m.)

23

24

25
```

```
 1                    (Tuesday, May 9, 2000, 9:25 a.m.)

 2                    (Jury present.)

 3          THE COURT:  Good morning.

 4                    If you would please raise your

 5               right hand and let me administer to you

 6               your oath in this case.

 7                    (Oath administered to jurors by the

 8                    Court at this time.)

 9          THE COURT:  Thank you very much.

10                    Yesterday after you were selected,

11               I gave you instructions with regard to

12               not discussing the case and other

13               matters.  Is there anyone who has been

14               unable to comply with those

15               instructions?

16                    (No response.)

17          THE COURT:  Okay.  Good.

18                    As I told you yesterday, and as you

19               know, you have been selected to hear and

20               decide the case of State of Alabama v.

21               Carl Emmett Wyatt.

22                    Mr. Wyatt is charged in this case

23               with the offense of Murder or Reckless

24               Murder.  And to that charge he comes

25               before you and says I'm not guilty.
```

```
 1              As I explained to you yesterday
 2         morning during the orientation, the
 3         burden of proof is on the State of
 4         Alabama to prove to you beyond a
 5         reasonable doubt that Mr. Wyatt is
 6         guilty of what he is charged with.
 7         There is no burden of proof at all on
 8         Mr. Wyatt or any other defendant for
 9         that matter.   As we discussed yesterday
10         morning, Mr. Wyatt comes into court
11         clothed in the presumption of
12         innocence.   That presumption remains
13         with him unless and until the State
14         proves to you beyond a reasonable doubt
15         each and every element necessary to
16         constitute guilt.
17              (Instructions to the jury by the
18              Court.)
19    THE COURT:   Having said those things I think
20         we will begin the trial of the case and
21         I will turn it over to Sam for opening
22         statement.
23              (Mr. Partridge delivers an opening
24              statement to the jury.)
25              (Mr. Bowers delivers an opening
```

1                    statement to the jury.)

2              THE COURT:   State may call their first

3                  witness.

4              MR. PARTRIDGE:   State would call Jerry

5                  McMichael.

6                      JAY MCMICHAEL

7          was sworn and testified as follows:

8                  DIRECT EXAMINATION

9    BY MR. PARTRIDGE:

10        Q.   Could you state your name for the record,

11   please?

12        A.   Jay McMichael.

13        Q.   Jay, how are you employed?

14        A.   Through the Autauga County Sheriff's Office.

15        Q.   And how long have you been employed in that

16   capacity?

17        A.   About three years.

18        Q.   How many investigations would you say you

19   have conducted in the course of your employment with

20   Autauga County?

21        A.   Probably anywhere from fifty to a hundred.

22        Q.   Okay.   And your title is a deputy sheriff; is

23   that correct?

24        A.   Yes, sir.

25        Q.   Jay, let me take you back to June 1 of

1    1999.    On that date were you dispatched to the

2    Prattville Community Hospital?

3          A.    Yes, sir.

4          Q.    And why were you dispatched to that location?

5          A.    We had a call that a subject had been shot

6    and the defendant was still on the scene.

7          Q.    And what do you mean by on the scene?

8          A.    He was at the hospital.

9          Q.    Okay.  And did you go to the hospital?

10         A.    Yes, sir.

11         Q.    Do you recall the name of the subject who had

12   been shot?

13         A.    Herman Searcy.

14         Q.    Do you recall the name of the offender?

15         A.    Ralph Wyatt.

16         Q.    When you got there --

17         A.    I'm sorry.  Carl Wyatt.

18         Q.    Thank you.

19               When you got to the hospital, did you see

20   Carl Wyatt on the scene?

21         A.    Not at first, no, sir.

22         Q.    When did you first see Carl Wyatt at the

23   hospital?

24         A.    I went in to talk to Mr. Searcy, the victim,

25   and the girl there at the hospital, the little

```
 1   receptionist, told me that the man outside said he

 2   brought them in and that he had made a couple of

 3   remarks that he was the one that shot him.

 4        Q.   Okay.  Did you investigate to see who the man

 5   outside was?

 6        A.   Yes, sir, I did.

 7        Q.   And who was it?

 8        A.   It was Carl Wyatt.

 9        Q.   Okay.  Is Carl Wyatt in the courtroom today?

10        A.   Yes, sir.   That's him.

11        Q.   You are identifying the man in the orange,

12   correct?

13        A.   Yes, sir.

14        Q.   Okay.

15             MR. PARTRIDGE:  Judge, if the record will

16                  reflect that he has identified the

17                  defendant.

18             THE COURT:  It will.

19             MR. PARTRIDGE:  Thank you, Your Honor.

20        Q.   Did you have any conversations with Carl

21   Wyatt at the hospital that day?

22        A.   No, sir, not at the time I didn't.  Not right

23   then.

24        Q.   Okay.  At any point thereafter, did you have

25   any conversations with Carl Wyatt?
```

1          A.    Yes, sir, I did.

2          Q.    Okay.    At any point did you Mirandize Carl

3     Wyatt?

4          A.    Yes, sir, I did.

5          Q.    Could you tell the Court, and for the record,

6     exactly what you told Mr. Wyatt when you Mirandized

7     him?

8          A.    That he had the right to -- I usually read it

9     off a card.

10         Q.    Okay.

11         A.    But that he had the right to remain silent.

12    Anything he said could and would be used against him in

13    a court of law.    That he had a right to an attorney and

14    to have one present for questioning.    And that if he

15    decided to exercise his rights at any time he could

16    stop answering questions.

17         Q.    Did he appear to you to understand those

18    rights?

19         A.    Oh, yes, sir.

20         Q.    Did he acknowledge that he understood those

21    rights?

22         A.    Yes, sir, he did.    I asked him clearly, "Do

23    you understand each of these rights?"    And he said,

24    "Yes, I do."

25         Q.    And at that point did you ask him any

1    questions about what had happened that day?

2        A.   Yes, sir.   I asked him what had happened to

3    Mr. Searcy, his friend.   He said, "I shot him and I

4    would shoot him again if I had to."

5        Q.   He said, "I shot him and I would shoot him

6    again if I had to"?

7        A.   Yes, sir.

8        Q.   Have you ever seen anybody in an intoxicated

9    state?

10       A.   Oh, yes, sir.

11       Q.   Okay.   Would that be based on your training

12   and experience as a law enforcement officer?

13       A.   Yes, sir, it would.

14       Q.   Okay.   On that date, did Carl Wyatt appear

15   to be in an intoxicated state?

16       A.   He didn't appear to be intoxicated, but you

17   could smell it from him.

18       Q.   What were you smelling?

19       A.   Just an intoxicating liquor.

20       Q.   And you have smelled that before?

21       A.   Yes, sir.

22       Q.   Did he say anything to you about drinking?

23       A.   He said that they had been drinking pretty

24   much all day.

25       Q.   He make any other statements about how the

1    shooting took place to you?

2        A.    He told me that Mr. Searcy had scared him and

3    he shot him is what he told me.

4        Q.    Did he say how Mr. Searcy had scared him?

5        A.    He said he came -- at first he told me that

6    he was bent down doing something on the couch and

7    Mr. Searcy come in and he turned and shot him.

8        Q.    Okay.    At first he told you that.    Did he

9    tell you anything different later?

10        A.    No, sir, because at that time I arrested him

11    and brought him to the sheriff's office and that's when

12    Lieutenant Nelson said we needed to wait.

13        Q.    Okay.    Now at any point did you have a

14    conversation with him about the weapon that was use in

15    this offense?

16        A.    Yes, sir, I did.

17        Q.    Okay.    What did you ask him about the

18    weapon?

19        A.    I asked him where it was.

20        Q.    And what did he tell you?

21        A.    He said he dropped it by the couch at his

22    house.

23        Q.    Did you determine whether or not that was

24    true?

25        A.    Yes, sir, we did.    I asked Lieutenant Nelson

1  to go to the house.  He did with two other officers.

2  They could not recover the weapon.

3       Q.    Was the weapon ever recovered?

4       A.    Yes, sir, it was.

5       Q.    Okay.  And where was the weapon recovered?

6       A.    It was -- I asked him if he may have threw it

7  in the car and he said he could have.   I asked him

8  what kind of car.  He said Mr. Searcy had a white

9  Chrysler Fifth Avenue.  I found the car in the parking

10 lot of the hospital and asked Mr. Wyatt could I search

11 the vehicle.  He said, "Yes." And I accidentally

12 recovered the weapon under the driver's seat.  Between

13 the driver's seat and center console.

14           MR. PARTRIDGE:  Judge, just for everybody's

15                safety could I just show you that the

16                weapon is not loaded and the chamber

17                will not open.   I'm going to have him

18                check the gun on the stand also.

19      Q.    I'm going to show you what is marked as

20 State's Exhibit Number 1.   Could you check that weapon

21 to determine if it is loaded at this time?

22      A.    No, it is not loaded.

23      Q.    Could you identify that for us?

24      A.    Yes, sir, this is the weapon we recovered --

25 yes, this is the weapon we recovered out of Mr.

1  Searcy's white, Chrysler Fifth Avenue.

2       Q.   That you recovered?

3       A.   Yes, sir, that I personally recovered.

4       Q.   Okay.   Did you give it to anybody after you

5  recovered it?

6       A.   Yes, sir, I turned it over to Lieutenant

7  Nelson to take to the Department of Forensic Sciences.

8       Q.   And, Jay, prior to you turning it over to

9  Lieutenant Nelson, did you alter the weapon at all?

10      A.   No, sir.   All we did of course we had to

11  secure the weapon.   We had to unload it.   And that's

12  the only thing we did to it.

13      Q.   So that was the only alterations was

14  unloading it?

15      A.   Yes, sir.

16      Q.   And was it in your care, custody, and control

17  until you turned it over to Lieutenant Nelson?

18      A.   Yes, sir, it was in my back pocket.

19      Q.   And does it appear today to be in the same

20  condition as on the date that you recovered it?

21      A.   Yes, sir, it does.

22      Q.   Okay.   When you referred a minute ago to

23  unloading the weapon, do you recall how many rounds

24  were in the weapon?

25      A.   It was six casings total.   Four live rounds

1    and two spent cartridges.

2         Q.    Okay.  And how many shells does that

3    particular weapon hold?

4         A.    Six.

5         Q.    Okay.  So there were four live rounds --

6         A.    Two spent casings, right.

7         Q.    Did you ever determine whether there were two

8    spent cartridges?

9         A.    Yes, sir.  I asked Mr. Wyatt -- a lot of

10   times they would carry an empty -- this does not have a

11   safety on this particular gun.  Okay.  If someone hits

12   the hammer it will fire the shell and the gun

13   accidently.  You are going to get shot in the tail end,

14   leg, or foot.  So a lot of times what they do is carry

15   a spent cartridge where the hammer lays.  And I asked

16   him that and he said yes.  But when we unloaded it out

17   of curiosity, the next shell casing was one that

18   fired.  So the two spent rounds were together.

19        Q.    Okay.  Now when you fire that weapon, do you

20   have to cock it or can you pull the trigger to fire it?

21        A.    You can pull the trigger.  See the hammer.

22        Q.    Um-huh.

23        A.    You can just pull the trigger, you don't in

24   essence have to cock it.

25        Q.    So Mr. Wyatt told you that for his safety,

1    for his safety, he kept a spent cartridge in the next

2    available chamber?

3        A.    No, sir, on the hammer.

4        Q.    On the hammer.

5        A.    Right.

6        Q.    Okay.

7        A.    Right where the hammer drops down is where he

8    kept the spent cartridge.

9        Q.    And there were four live rounds?

10       A.    Four five rounds.

11       Q.    And one other round that was spent?

12       A.    Correct.

13             MR. PARTRIDGE:   Judge, I believe that's all

14                   at this time.

15                   CROSS EXAMINATION

16   BY MR. BOWERS:

17       Q.    Officer McMichael, how did the -- how did

18   Mr. Searcy get to the hospital?

19       A.    Mr. Searcy advised me and also Mr. Wyatt

20   advised me, that Mr. Wyatt had drove him there.

21       Q.    Drove him to the hospital himself?

22       A.    Yes, sir.

23       Q.    All right.   And when you got there Mr. Wyatt

24   was still at the hospital; is that correct?

25       A.    That's correct.

```
1        Q.   All right.   And when you talked and
2   interviewed Mr. Wyatt, did he cooperate with you?
3        A.   Yes, sir.
4        Q.   In answering your questions?
5        A.   Yes, sir.
6        Q.   He cooperated with you in every way?
7        A.   Yes, sir.
8        Q.   All right.
9             MR. BOWERS:  Thank you.  I believe that's all
10                 I have.
11            MR. PARTRIDGE:  Judge, that's all we have.
12                 State would call Michael Burks, Your
13                 Honor.
14                      MICHAEL BURKS
15            was sworn and testified as follows:
16                    DIRECT EXAMINATION
17   BY MR. PARTRIDGE:
18        Q.   Could you state your name for the record,
19   please?
20        A.   Michael Burks.
21        Q.   How are you employed, Mr. Burks?
22        A.   Autauga County Sheriff's Department,
23   sergeant.
24        Q.   How long have you been employed with the
25   Autauga County Sheriff's Department?
```

1      A.    A little over seven years.

2      Q.    Okay.   Tell us a little bit about what you

3  do with the sheriff's department.

4      A.    I supervise deputies, catch calls, general

5  public, deal with them.

6      Q.    And when you supervise deputies, if a deputy

7  was investigating for example a crime or an occurrence,

8  would it be your job to oversee that investigation?

9      A.    Yes, sir.

10     Q.    Would you typically go to the scene of the

11  investigation?

12     A.    That's correct.

13     Q.    Michael, let me take you back to June 1 of

14  1999.   Do you recall being dispatched to the

15  Prattville hospital?

16     A.    Yes, sir.

17     Q.    Exactly which hospital is that?

18     A.    That is the one in Prattville emergency room

19  up here on Highway 31 in Prattville.

20     Q.    And do you recall why you were dispatched to

21  that location?

22     A.    Yes, sir, we had a person that was assaulted

23  by a weapon, had been shot.

24     Q.    Okay.   Do you recall who that was?

25     A.    Yes, sir.

1        Q.    Do you recall the name of the individual who
2    was the suspect in the case?

3        A.    Mr. Wyatt.

4        Q.    Would it be fair to say it was Mr. Wyatt?

5        A.    Wyatt.

6        Q.    Carl Wyatt?

7        A.    Yes, sir, that's it.  Carl Wyatt.

8        Q.    Okay.  And when you got to the hospital, did
9    you ever see Mr. Carl Wyatt?

10       A.    Yes, sir.

11       Q.    Okay.   Tell us about how you saw
12   Mr. Wyatt.

13       A.    When I arrived at the hospital, Deputy Jay
14   McMichael was there at the scene already.   And
15   Mr. Wyatt was standing outside the hospital.   So the
16   deputy started explaining to me what he was doing in
17   the report.   And I overheard Mr. Wyatt make a
18   statement that he said, "Yes sir, I shot him."

19            MR. BOWERS:  Your Honor, I object to any
20                 testimony that he overheard a
21                 statement.  Improper foundation.

22            THE COURT:  Sustain.  Lay a little
23                 foundation.

24       Q.    Did the defendant make any type of admission
25   that you were present for?

1    A.    That I was present in front of him?

2    Q.    Yes, sir.

3    A.    I was looking right at him.

4    Q.    Okay.  And tell the Court what admission he

5    made while you were standing there looking directly at

6    him?

7                MR. BOWERS:  Objection, Your Honor, improper

8                    foundation.

9                THE COURT:  Let's lay the rest of the

10                   foundation.  Who, when, where.

11   Q.    About how long after you got to the hospital

12   did you first encounter Carl Wyatt?

13   A.    Immediately when I arrived.

14   Q.    And exactly where was that at the hospital?

15   A.    Outside the emergency room.

16   Q.    Okay.  Was there anybody else present?

17   A.    Deputy McMichael.

18   Q.    Okay.  Is Carl Wyatt in the courtroom today?

19   A.    Yes, sir.

20   Q.    Okay.  Is this the man that you heard make

21   an admission or statement?

22   A.    That's correct.

23   Q.    Okay.  Did you ever hear the deputy Mirandize

24   him?

25   A.    Not at that time, sir.

1    Q.    Okay.    At that point was he free to leave?

2    A.    No, sir, he was fixing to be arrested.

3    Q.    Okay.    Was the case in the investigation

4    stage at that point?

5    A.    Sir?

6    Q.    Was the case in the investigation stage?

7    A.    That's correct.

8    Q.    Okay.    Have you ever seen someone

9    intoxicated before based on your training and

10   experience as a law enforcement officer?

11   A.    Yes, sir.

12   Q.    And at that point did Mr. Wyatt appear to you

13   to be intoxicated?

14   A.    Yes, he was.

15   Q.    Okay.    Could you tell the jury exactly why

16   you made that determination?

17   A.    Well, I could smell alcohol.    I got close to

18   him.    And he was leaning on a building and he would

19   try to stand up and he was wobbling, could not hardly

20   stand.

21   Q.    Okay.    And while you were talking to him and

22   while he was talking to the deputy, did you actually

23   have a conversation with him at all?

24   A.    No, sir.

25   Q.    Okay.    But you were right there present

1    while the deputy was having a conversation?

2        A.    Well, the deputy had never had a conversation

3    with him.  He was telling me -- I said, "Do your

4    report, we are fixing to Mirandize him and get a

5    statement from him."

6        Q.    But when Carl Wyatt was speaking, was making

7    an admission, were you standing right there listening

8    to him?

9        A.    Yes, sir.

10       Q.    Okay.  Could you tell the jury what he said?

11            MR. BOWERS:  Your Honor, same objection.  I

12                will be glad to approach the bench if

13                you want to hear further from me.

14            THE COURT:  Yes.

15                (Bench conference, off record.)

16            THE COURT:  Objection sustained.

17       Q.    Okay.  Sergeant Burks, based on your

18    training and experience as a law enforcement officer,

19    your testimony is that he did appear to you to be

20    intoxicated; is that correct?

21       A.    Yes, sir.

22            MR. PARTRIDGE:   No further questions, Judge.

23            MR. BOWERS:  No questions, Judge.

24            THE COURT:  Thank you, Sergeant.

25            MR. JAMES:  State would call Sergeant

1          John McDaniel.

2            JOHN MCDANIEL

3      was sworn and testified as follows:

4            DIRECT EXAMINATION

5   BY MR. JAMES:

6      Q.   Could you state your name and occupation for

7   the Court, please?

8      A.   My name is John McDaniel.  I'm a lieutenant

9   with the Prattville Police Department assigned to the

10  investigative division.

11     Q.   And were you employed in that capacity on

12  June 1, 1999?

13     A.   I was in investigation, at the time I was at

14  the rank of sergeant.

15     Q.   Okay.  Since you have been promoted to

16  lieutenant?

17     A.   Correct.

18     Q.   All right.  Lieutenant, on June 1 of '99, did

19  you have an occasion to come in contact with a Carl

20  Wyatt?

21     A.   Yes, sir, I did.

22     Q.   Do you see that person in the courtroom

23  today?

24     A.   Yes, sir.

25     Q.   Could you identify him for us?

1          A.    That gentleman sitting at the right over

2    there.

3          Q.    The gentleman in the orange?

4          A.    Correct.

5          Q.    Okay.   How is it that you came to see

6    Mr. Wyatt on that day?

7          A.    I was contacted by our communications to

8    respond to the police department to run an intoxilyzer

9    test.

10         Q.    And did you respond?

11         A.    I did.

12         Q.    All right.   When you were there you came in

13   contact with Mr. Wyatt, correct?

14         A.    Yes, sir.

15         Q.    All right.   Now what instrument does your

16   department use to test for intoxication?

17         A.    At the time we were using the Intoxilyzer

18   5000.

19         Q.    Okay.   Now are you trained in how to operate

20   that machine?

21         A.    Yes, sir.

22         Q.    Is there some sort of certification process

23   you go through?

24         A.    Yes, sir.

25         Q.    Okay.   What is entailed in the certification

1   process?

2       A.   We have to go through a course that is put on

3   by the Department of Forensic Science.   And after

4   completing the course we end up taking a test.   We were

5   tested every, I think it is every two years to maintain

6   our certification.

7       Q.   And you were certified at the time of this

8   test?

9       A.   Yes, sir, I was.

10      Q.   All right.   What did you do when you first

11  came in contact with Mr. Wyatt?

12      A.   I had him placed before the instrument then

13  directed him off of the blue sheet that is provided by

14  the Department of Forensic Science as far as how to

15  perform the test itself.

16      Q.   Okay.   You say -- do you have a blue sheet

17  with you?

18      A.   Yes, sir, I do.

19      Q.   Okay.   And you used the blue sheet in this

20  case; is that correct?

21      A.   That's correct.

22      Q.   You said there is an instruction on how to do

23  the test?

24      A.   Yes, sir.

25      Q.   Is that the same instruction that is outlined

1  by the Department of Forensic Science for breath test?

2      A.    Yes, sir, it is.

3      Q.    And did you follow this procedure on this

4  breath test?

5      A.    Yes, sir.

6      Q.    Okay.  How do you get your results from the

7  intoxilyzer?

8      A.    The instrument -- after the subject blows

9  into the instrument, the instrument itself prints out

10  the results.

11      Q.    Okay.  Are those results recorded anywhere

12  else?

13      A.    I maintain -- there is a log book that we

14  maintain and I recorded those, my results from the

15  record into that log book.

16      Q.    Okay.  Where is that log book kept?

17      A.    It is kept there with the instrument itself,

18  in the secured room that is under lock and key.

19      Q.    Okay.  Other than the results you get from a

20  particular suspect or defendant, is there anything

21  else, any other records kept in that log book?

22      A.    As far as the test records itself and then

23  every month it is inspected.

24      Q.    Okay.  What is the reason for the

25  inspection?

1      A.   To make sure the instrument is properly

2  working.

3      Q.   Okay.   I'm going to hand you now what is

4  marked as State's Exhibit 1, cumulatively.   It is about

5  three different pages.   It is two.

6           Okay.   Would you identify that for the Court,

7  please?

8      A.   It is a log record from the Intoxilyzer room.

9      Q.   Okay.   Is Mr. Wyatt's test on there, the

10  results of his test?

11           MR. BOWERS:   Your Honor, I object to any

12                further testimony concerning this

13                document.   Improper foundation.

14           THE COURT:   Overrule for the limited purpose

15                of the question that was asked, but I'm

16                sure I will get the objection again

17                after this question is answered.

18           MR. BOWERS:   What was the question?

19           THE COURT:   Is his name on there?

20           MR. BOWERS:   Yes, sir.

21           THE COURT:   You may answer that question.

22      Q.   Is Mr. Wyatt's name on there?

23      A.   Yes, sir, it is.

24      Q.   All right.   Now in keeping these records, is

25  that done in the regular course of business at the

1  jail?

2       A.   Yes, sir, it is.

3       Q.   Is Mr. Wyatt's results entered with his name?

4       A.   Yes, sir, it is.

5       Q.   Okay.   Now prior to Mr. Wyatt's result,

6  there any evidence of inspection done prior to his

7  test?

8       A.   Yes, sir, there is.

9       Q.   What is the date of that inspection?

10      A.   On May the 14 of 1999.

11      Q.   All right.   And is there an indication as to

12  whether or not the machine is working properly?

13      A.   It states, checks passed.

14      Q.   So on May 14 that test was done and it

15  passed, correct?

16      A.   Yes, sir.

17      Q.   Now what date was Mr. Wyatt's test done on?

18      A.   On June 1 of 1999.

19      Q.   Okay.   Now is there a record of any

20  inspection done after that test?

21      A.   Yes, sir, there is.

22      Q.   Okay.  What is the date of that inspection?

23      A.   June the 4 of 1999.

24      Q.   Okay.  Is there any indication as to whether

25  or not the machine was working properly on that day?

1     A.   Comments are checked, passed.

2     Q.   All right.   Now -- so according to the log

3  book the machine was working properly before the

4  defendant's test and after the defendant's test; is

5  that right?

6     A.   Yes, sir.

7     Q.   What time was it when you gave him this test?

8     A.   2158 hours which is 9:58 p.m.

9     Q.   Okay.   And what was the result of that test?

10         MR. BOWERS:  Objection, Your Honor.  Improper

11              foundation as to the results of the

12              test.

13         THE COURT:  Sustained.

14         MR. JAMES:  Judge, may I approach?

15         THE COURT:  Sure.

16              (Bench conference, off record.)

17     Q.   Lieutenant McDaniel, could you describe for

18  the jury exactly what you did in testing Mr. Wyatt?

19     A.   I placed him before the instrument.   I

20  attached the mouth piece.

21     Q.   Any type of deprivation period did you go

22  through?

23     A.   There is a twenty-minute waiting period prior

24  to giving the exam.   Which is that was --

25     Q.   Okay.   What is the purpose for that

1  deprivation period?

2      A.   It allows the element inside the instrument

3  to warm-up to make sure everything is properly

4  functioning.

5      Q.   Okay.   During that time, did you observe the

6  defendant?

7      A.   Yes, sir, I did.

8      Q.   Okay.  Did you note if he coughed or

9  hiccupped or vomited or took anything in his mouth?

10     A.   No, sir, he was -- nothing at that time.

11     Q.   Okay.   And you were certified at the time

12  you gave this test?

13     A.   Yes.

14     Q.   And you have your certification card if

15  defense counsel would like to see it?

16     A.   Yes, sir, I do.

17          MR. BOWERS:  Are you offering his card?

18          MR. JAMES:  Judge, I will offer the card as

19              State's Exhibit Number 3.

20              (State's Exhibit 3 was marked for

21              identification.)

22     Q.   Now, Lieutenant McDaniel, what was the time

23  that you gave him this test?

24     A.   At 2158 hours, 9:58 p.m.

25     Q.   Okay.  And what was the result of that test?

1           MR. BOWERS:  Objection, Your Honor.  Same

2           objection.   Improper foundation.

3         THE COURT:  Overrule.   You can testify as to

4           the results.

5             Well, wait a minute.  Let me see

6           your card.

7             Let's just stop a minute.

8             Ladies and gentlemen, I'm going to

9           give you a break for fifteen minutes so

10          we can do a couple of things we need to

11          do and then we will continue on.

12            (The Court admonished the jury.)

13            (Jury not present.)

14            (Discussion held off record between

15          Court and counsel.)

16            (Jury Present.)

17     Q.   Lieutenant McDaniel, you stated that you are

18  certified; is that correct?

19     A.   Yes, sir.

20     Q.   You were certified on the date of this test

21  June 1; is that correct?

22     A.   That's correct.

23     Q.   And do you have your certification card with

24  you?

25     A.   Yes, sir.

1      Q.    Okay.    I'm going to show you what is marked

2   as State's Exhibit 3, a two-page document.    Can you

3   identify that for the Court, please?

4      A.    It is a photocopy front and back of my card.

5      Q.    Okay.    Is that an exact copy of the front and

6   back of your card?

7      A.    Yes, sir.

8      Q.    Okay.    Does it show on there when you

9   received your training?

10     A.    This card issued October 1 of 1998.

11     Q.    Okay.    Any notations as to retraining?

12     A.    Retrained September of 1999.

13     Q.    Okay.    And when does that card expire?

14     A.    October 31 of 2000.

15     Q.    The card was valid at the time of this test?

16     A.    Yes, sir, it was.

17     Q.    Okay.

18           MR. JAMES:    Judge, I move to admit this at

19               this time.

20           THE COURT:    State's Exhibit 3 is admitted.

21               (State's Exhibit 3 was admitted in

22               evidence.)

23           MR. JAMES:    Thank you, Your Honor.

24     Q.    Lieutenant McDaniel, what was the result of

25   the test you gave the defendant on June 1, 1999?

1          MR. BOWERS:  Same objection, Your Honor.

2                Improper foundation.

3          THE COURT:  Overrule.

4     A.   The blood alcohol content was .15 percent.

5     Q.   Okay.  Did you receive a printout from the

6  intoxilyzer?

7     A.   Yes, sir, I did.

8     Q.   I hand you what has been marked as State's

9  Exhibit 4.  Could you identify that for the Court,

10  please?

11     A.   Part of the printout from that date.

12     Q.   Does that give you the result of the test you

13  gave him?

14     A.   Yes, sir, it does.  .15 percent.

15     Q.   Okay.  What time was that?

16     A.   At 2158 hours, 9:58 p.m.

17     Q.   Okay.

18          MR. JAMES:  Judge, I would like to move to

19                admit this at this time.

20          THE COURT:  Any objection?

21          MR. BOWERS:  Yes, sir, Your Honor.  Same

22                objection.  Improper foundation.

23          THE COURT:  Objection overruled.  State's

24                Exhibit 4 is admitted.

25                (State's Exhibit 4 was admitted in

1                             evidence.)

2           Q.    Lieutenant McDaniel, what is the legal limit

3    of intoxication in Alabama?

4           A.    .08 percent.

5                 MR. BOWERS:  Objection, Your Honor.

6                       Qualification to answer the question.

7                 THE COURT:  Sustained.

8           Q.    In the course of your -- describe your duties

9    as a police officer.

10          A.    Enforce the laws, regulations within the

11   police jurisdiction, city limits of the City of

12   Prattville.

13          Q.    In the course of that, have you had occasion

14   to make any DUI cases?

15          A.    Yes, sir, I have.

16          Q.    And in the course of making DUI cases, does

17   it fall upon you to test individuals for blood alcohol

18   content?

19          A.    Yes, sir, it does.

20          Q.    Okay.   In the course of your investigations

21   as a police officer, do you need to know what the legal

22   limit is in Alabama?

23          A.    Yes, sir, I do.

24          Q.    Okay.  Do you know what the legal limit is in

25   Alabama?

```
1        A.    Yes, sir, I do.

2        Q.    And what is that?

3        A.    .08 percent is legally intoxicated.

4        Q.    Okay.

5              MR. JAMES:   That's all I have, Judge.

6              THE COURT:   All right.

7              MR. BOWERS:  No questions, Your Honor.

8              THE COURT:   May Lieutenant McDaniel be

9                  excused?

10             MR. PARTRIDGE:  Yes, sir, Your Honor.

11             THE COURT:   Thank you.

12             MR. PARTRIDGE:  State would call Joe

13                 Sedinger.

14                      JOE SEDINGER

15             was sworn and testified as follows:

16                   DIRECT EXAMINATION

17   BY MR. PARTRIDGE:

18        Q.    Could you state your name for the record,

19   please?

20        A.    Joe Sedinger.

21        Q.    Mr. Sedinger, how are you employed?

22        A.    I work in the sheriff's department as an

23   investigator.

24        Q.    Okay.  How long have you worked for the

25   sheriff's department as an investigator?
```

1    A.    I have been an investigator about three

2  years.    Worked for the sheriff about five.

3    Q.    You have been in law enforcement for about

4  five years.

5    A.    Five and a half.

6    Q.    I want to take you back to June 2, 1999.

7  We're you present with Lieutenant Donny Nelson for an

8  interview with a Carl Wyatt?

9    A.    Yes, sir.

10    Q.    Is Carl Wyatt in the courtroom today?

11    A.    Yes, sir.

12    Q.    Could you point him out for us, please?

13    A.    There.

14    Q.    Mr. Sedinger, where did the interview take

15  place?

16    A.    Lieutenant Nelson's office.

17    Q.    Okay.  Do you remember approximately what

18  time?

19    A.    8:32 is when he read the Miranda Rights.

20    Q.    Okay.  And were you present when the Miranda

21  rights were read to Carl Wyatt?

22    A.    Yes, sir.

23    Q.    Okay.  Could you indicate to this jury and

24  to the court exactly what was read to Carl Wyatt?

25    A.    Okay.  Constitutional rights according to

 1   the Miranda Warnings.

 2          Said, number one, you have a right to remain

 3   silent.

 4          Number two, anything you say can and will be

 5   used against you in a court of law.

 6          Number three, you have a right to talk to a

 7   lawyer before you make any statement and to have him

 8   present with you while you are being questioned.

 9          Number four, if you cannot afford to hire a

10   lawyer one will be appointed to represent you before

11   you are questioned.

12          Number five, you choose to make a statement

13   you have the right to stop talking at any time.

14          And number one, do you understand each of

15   these rights I explained to you?  And having these

16   rights in mind do you wish to talk to us now?

17     Q.    Okay.  Stopping you right there for a

18   minute.

19          The form you are reading from, did Carl Wyatt

20   indicate that he understood those rights?

21     A.    Yes, sir.

22     Q.    And are there areas on that form where he can

23   make that indication in his own handwriting?

24     A.    Yes, sir.  Initial beside each one of the

25   statements.

```
 1        Q.    He initialled beside which statements?

 2        A.    Between one through five, the Miranda

 3   Warning.   And he initialled in the yes block on the,

 4   do you understand each of these rights I explained to

 5   you?  And the yes block, having these rights in mind

 6   you wish to talk to us now?

 7        Q.    Did you actually physically witness him

 8   initial those?

 9        A.    Yes.

10        Q.    You signed off as a witness to this form,

11   right?

12        A.    Yes, sir.

13        Q.    Is there a Waiver of Rights section that

14   further explains his rights to him?

15        A.    Yes, sir.

16        Q.    Could you slowly, please, read into the

17   record and for this jury what the Waiver of Rights

18   tells -- told Carl Wyatt?

19        A.    The Waiver of Rights.

20              I have read or had read to me this statement

21   of my rights.   And I understand what my rights are.

22   I am willing to make a statement and answer

23   questions.   I do not want a lawyer at this time.   I

24   understand and know what I am doing.   No promises or

25   threats have been made to me and no pressure of any
```

1  kind has been used against me to make a statement.

2    Q.   Joe, while you were present, were any threats

3  made toward Mr. Wyatt?

4    A.   No.

5    Q.   Did you promise him -- did anybody promise

6  him anything?

7    A.   No, sir.

8    Q.   Okay.   No one threatened him, or promised

9  him anything?

10    A.   No, sir.

11    Q.   Did he appear to understand what he was

12  doing?

13    A.   Yes, sir.

14    Q.   Okay.   On June 2 of 1999 when you went over

15  this form that you witnessed with him, did he appear to

16  be intoxicated at that time?

17    A.   No, sir.

18    Q.   Okay.   This is of course the morning after

19  June 1 and your testimony is it was about 8:32,

20  correct?

21    A.   Yes, sir.

22    Q.   Did he appear to be sleepy or under the

23  influence of anything?

24    A.   No, sir.

25    Q.   Okay.   Did he indicate on there what his age

```
1    was?

2         A.    57.

3         Q.    Okay.  And did he indicate a birthday?

4         A.    Yes, sir.  8-3-41.

5         Q.    Did you ask him anything about how far he

6    went in school?

7         A.    Lieutenant Nelson did.  He put tenth grade

8    and he got a GED.

9         Q.    Did he indicate whether or not he could read

10   or write?

11        A.    Not on this form he didn't, but I think he

12   did tell the investigator he could read and write.

13        Q.    But there were no threats or promises made

14   before he gave this statement; is that correct?

15        A.    Right.

16             MR. PARTRIDGE:  That's all from this witness,

17                  Judge.

18                  CROSS EXAMINATION

19   BY MR. BOWERS:

20        Q.    Officer, did Mr. Wyatt sign that form that

21   you just read from?

22        A.    Yes, sir.

23        Q.    After the waiver?

24        A.    Yes, sir.

25        Q.    So in addition to the initialling everywhere
```

```
 1   that he understood, fully understood his rights, he

 2   went on to sign that form also?

 3        A.    Yes, sir.

 4              MR. BOWERS:  That's all I have.

 5              THE COURT:  Anything further?

 6              MR. PARTRIDGE:  No, sir.

 7              THE COURT:  Thank you.

 8              MR. BOWERS:  Reserve the right to recall him

 9                   if necessary, Your Honor.

10              THE COURT:  I imagine if we need him we can

11                   find him.

12                        DONNY NELSON

13              was sworn and testified as follows:

14                      DIRECT EXAMINATION

15   BY MR. PARTRIDGE:

16        Q.    Could you state your name for the record,

17   please?

18        A.    Chief Deputy Donny Nelson, Autauga County

19   Sheriff's Department.

20        Q.    How are you employed, Mr. Nelson?

21        A.    Chief Deputy with Autauga County Sheriff's

22   Department.

23        Q.    And how long have you been chief deputy?

24        A.    Since the first of May.

25        Q.    So not very long.
```

1       A.    Not very long.

2       Q.    And before you became chief deputy, what were

3  your duties with the Autauga County Sheriff's

4  Department?

5       A.    I was the chief investigator.

6       Q.    And how long were you employed in that

7  capacity?

8       A.    About seven years.

9       Q.    And over the course of those seven years, how

10 many -- let's break it down, murder investigations

11 would you say that you have investigated?

12      A.    75, 100.

13      Q.    Donny, let me take you back first to 6-1 of

14 1999.

15      A.    Yes, sir.

16      Q.    Did you investigate a shooting incident

17 involving Carl Emmett Wyatt as a suspect?

18      A.    Yes, sir, I did.

19      Q.    And could you tell the Court on 6-1 of 1999

20 what you did or tell the jury what you did in

21 furtherance of that investigation?

22      A.    What I did I received a call at home that

23 Mr. Herman Searcy had been shot and was at the

24 emergency room with Mr. Carl Wyatt.  I got on my

25 clothes and I came down to the station.    At that point

1  Mr. Searcy was being transported.  I never talked to

2  him.   He was being transported to Jackson Hospital.

3       Q.    Donny, did you go to the scene where the

4  shooting occurred?

5       A.    Yes, sir, I did.

6       Q.    Okay.  Could you tell us where exactly that

7  was?

8       A.    Yes, sir.   It was at 1744 Alpine Drive.

9       Q.    Is that in Autauga County?

10       A.    In Autauga County, yes, sir.

11       Q.    Okay.   And could you tell us a little bit

12  about what you observed at the scene?

13       A.    I went to the scene to try and find the

14  weapon used in the shooting.   But we took some photos

15  of the residence and looked for the weapon which I

16  could not recover at the scene.

17       Q.    So you did not recover the weapon at the

18  scene?

19       A.    No, sir, I couldn't find it.

20       Q.    Was the weapon later turned over to you?

21       A.    Yes, sir.

22       Q.    And who turned the weapon over to you?

23       A.    Jay McMichael.  Deputy Jay McMichael.

24       Q.    And what did you do with the weapon when he

25  turned it over to you?

1        A.    I locked it in my safe.

2        Q.    So from that point was it in your care,

3    custody, and control?

4        A.    In mine, yes, sir.

5        Q.    Did you alter the weapon at all?

6        A.    No, sir.

7        Q.    Okay.  Did you do anything else with the

8    weapon after you locked it in your safe?

9        A.    Yes, sir.   On June 24 I took it to Forensic

10   Science along with the projectile for comparison.

11       Q.    Okay.   At any point did you pick the weapon

12   up from Forensic Science?

13       A.    Yes, sir, I did.   In October.

14       Q.    Was the weapon tested at Forensic Sciences?

15       A.    No, sir, it wasn't.

16       Q.    So it had not been tampered with at all at

17   Forensic Sciences; is that your testimony?

18       A.    No, sir, they did not test the bullet --

19       Q.    From that point on, it was again in your

20   care, custody, and control; is that correct?

21       A.    Yes, sir.

22             MR. BOWERS:  Objection, Your Honor.   He is

23                  leading the witness.

24             THE COURT:  That's okay.   Go ahead.

25       Q.    And after you picked it up from Forensic

1    Sciences, did you alter it in any way?

2        A.    No, sir, I didn't.

3        Q.    Let me show you what is marked as State's

4    Exhibit Number 1.    Tell the jury what I have handed

5    you.

6        A.    Yes, sir.    This is the -- this is the weapon

7    that I took to Forensic Sciences, Officer McMichael

8    turned over to me.

9        Q.    And since you picked it up that's the weapon

10   that has been in your care, custody, and control?

11       A.    Yes.

12       Q.    Does it appear to be in the same condition as

13   it was on the date you recovered it from Officer

14   McMichael?

15       A.    Yes, sir, it does.

16       Q.    And does it appear to be in the same

17   condition that it was on the date that you picked it up

18   from Forensic Sciences?

19       A.    Yes, sir, it does.

20            MR. PARTRIDGE:  Judge, at this point we move

21                to admit State's Exhibit Number 1.

22            MR. BOWERS:  Objection, Your Honor.  Improper

23                chain.

24            THE COURT:  Objection overruled.  State's

25                Exhibit 1 will be admitted.

```
 1                    (State's Exhibit 1 was admitted in

 2                    evidence.)

 3        Q.    Donny, let me take you once again back to the

 4   scene.    What was the name of that road again?

 5        A.    1744 Alpine Drive.

 6        Q.    Let me show you what I'm going to mark as

 7   State's Exhibits 5 and 6.   I show you what I have

 8   marked as State's Exhibits 5 and 6.    Would you

 9   describe to us what is in the photos that you are

10   holding?

11        A.    This is a photo of the living room and the

12   kitchen area which was in the same room of Mr. Herman

13   Searcy's mobile home where myself and Deputy Evans was

14   up there hunting a gun.

15        Q.    Did you observe any alcohol on the premises?

16        A.    Yes, sir, I did.

17        Q.    Okay.   Could you just describe to us what you

18   observed and where on that premises?

19        A.    I remember there was -- I mean it was

20   different cans and bottles and things around there and

21   there was also I believe it was a gallon milk jug had a

22   balloon attached to it where it was homemade wine being

23   made.   Had a strong odor of wine being made.

24        Q.    And was there a substance in that milk jug or

25   was it empty?
```

```
 1        A.    No, sir, it was a substance.

 2        Q.    Were there substances in the other cans and

 3   bottles or were they empty?

 4        A.    Some of them was empty some of them was half

 5   full.

 6        Q.    Okay.    The photos that you are holding, do

 7   they fairly and accurately represent the scene that you

 8   observed on June 1 of 1999?

 9        A.    Yes, sir.

10              MR. PARTRIDGE:    Judge, at this point we move

11                  to admit State's Exhibits 5 and 6.

12              MR. BOWERS:    No objection.

13              THE COURT:    5 and 6 are admitted.

14                  (State's Exhibits 5 and 6 were admitted

15                  in evidence.)

16        Q.    Donny, on June 1 of 1999, did you encounter a

17   defendant Carl Wyatt on that day?

18        A.    Yes, sir, I did.

19        Q.    And could you tell us where you encountered

20   Carl Wyatt?

21        A.    At the Autauga County Sheriff's Office

22   downstairs.

23        Q.    Did you have any type of conversation with

24   him at that time?

25        A.    Yes, sir.    I had a brief conversation.
```

1  I -- Mr. Wyatt had already been Mirandized.  We had a

2  brief conversation.  But it was very brief.  He was --

3      Q.  Donny, at any point did you decide not to

4  conduct a formal interview with the defendant?

5      A.  Yes, sir.  That's very brief because I --

6  Mr. Wyatt I observed him in my opinion I thought he was

7  possibly, probably intoxicated.  And I asked him to --

8  if they would administer an intoxilyzer test.

9  Transport him to Prattville and test him to see how

10  much alcohol -- because.  I didn't think Mr. Wyatt --

11  it was time to interview him at that point.

12      Q.  Now, Donny, so your testimony is that you

13  believed him to be intoxicated, correct?

14      A.  Yes, sir.

15      Q.  Based on your training and experience as a

16  law enforcement officer?

17      A.  Based on what?

18      Q.  Based on your training and experience as a

19  law enforcement officer.

20      A.  I am an intoxilyzer operator.  I probably

21  arrested several hundred DUI's to public intoxication.

22  Strong odor of alcoholic beverage coming from his

23  breath.

24      Q.  So it is your testimony that you did not want

25  to formally interview him in an intoxicated state,

1  correct?

2       A.   No, sir.

3       Q.   Did you interview him the next day on June

4  the 2nd of 1999?

5       A.   Yes, sir, I did.

6       Q.   Okay.   Donny, where were you when you

7  interviewed him and who was present, please?

8       A.   In my office downstairs, Autauga County

9  Sheriff's Department, inside the courthouse.

10       Q.   And were his Miranda Rights read to him?

11       A.   Yes, sir, it was.

12       Q.   Do you recall who read his Miranda Rights to

13  him?

14       A.   Yes, sir.   I have a copy of it right here.   I

15  read the Miranda Rights to him and Sergeant Sedinger

16  was there and he witnessed it.

17       Q.   Did you read him the customary Miranda

18  Rights?

19       A.   Yes, sir.

20       Q.   Okay.   Just briefly.   Just the first, please,

21  five lines could you tell the Court what you read to

22  him?

23       A.   Number one, you have the right to remain

24  silent.

25            Number two, anything you say can and will be

1    used against you in a court of law.

2           Number three, you have the right to talk to a

3    lawyer before you make any statement and to have him

4    present with you while you are being questioned.

5           Number four, if you cannot afford to hire a

6    lawyer, one will be appointed to represent you before

7    you are questioned.

8           Number five, if you choose to make a

9    statement, you may exercise your rights to stop talking

10   at any time.

11       Q.    Okay. Donny, did you threaten him in any

12   way?

13       A.    No, sir, I did not.

14       Q.    You didn't threaten him to get him to give

15   you a statement; is that correct?

16       A.    No, sir.

17       Q.    Did you promise him anything?

18       A.    No, sir, I didn't.

19       Q.    Did he appear to understand these rights?

20       A.    Yes, sir.

21       Q.    Did he indicate that he had at least some

22   high school education?

23       A.    Yes, sir. He says he got a GED and completed

24   the tenth grade.   Got a GED.

25       Q.    And, Donny, on the morning of June 2 of 1999,

1    did he appear to be still intoxicated?

2         A.   No, sir, he didn't.

3         Q.   Donny, if you could flip to the first page of

4    the defendant's statement.

5              At that point did you ask him some questions

6    and have him answer you?

7         A.   Yes, sir, I did.

8         Q.   Okay.   Very slowly, Donny, if you could,

9    could you read exactly what you asked him and how he

10   answered?

11        A.   Okay.

12             First question I asked him was, "Carl, last

13   night between 5 and 5:30 p.m., June 2, 1999, Herman

14   Searcy was shot at his residence at 1744 Alpine Drive

15   in Autauga County, Alabama.  Do you know who shot him?"

16             Answer was, "I did."

17             And question was, "What with?"

18             "A .22 short revolver."

19             Question.  "Why did you shoot him?"

20             Answer.  "I had been staying with Mr. Searcy

21   on and off for about two months.   During this time we

22   had reported three break-ins.   Mr. Searcy didn't have

23   any kind of weapon in his residence, so I bought the

24    .22 caliber short revolver about three weeks ago in

25   Montgomery, Alabama at a night club from a man I didn't

1   know for ten dollars.   Junior Morrison owns the night

2   club next to Tony's Pizza on Bell Street.   I think it

3   is called Cowboys, but I am not sure.   Anyway

4   yesterday about 3 a.m., June the 1, 1999, Herman Searcy

5   and myself started drinking beer.   About 9 a.m., June

6   1, me and Herman went to Winn-Dixie in Millbrook and we

7   bought some more beer, at the time and bought six more

8   beers.   We had about twelve beers left in the

9   refrigerator at home.   We drank beer until about 12:30

10  p.m. noon that day June 1, 1999.   Then my VA check

11  came in the mail.   I believe we had drank about

12  eighteen beers by then.   Also before my check came we

13  had drank about four or five cups each of homemade wine

14  in addition to the beer. After my check came we went to

15  Peoples Bank in Millbrook and cashed it, $96.   We left

16  the bank and went to the ABC Store in Millbrook and

17  bought a fifth of Canadian whiskey.   Then we went back

18  to Herman's house and drank the fifth of whiskey.   At

19  that point I fell asleep sitting up on the couch in the

20  living room.   On the end closest to the door I had a

21  pistol beside me stuck under the couch cushion.  All of

22  a sudden I heard the front door open.   I woke up.   It

23  startled me.   I saw someone standing there.   I grabbed

24  the gun and shot the person.   At that time I didn't

25  know who it was.   I had told Mr. Searcy before don't

1   talked to both Mr. Wyatt and Mr. Searcy.    And I

2   explained to them -- we were going up there I mean we

3   went up there two or three times.    But I -- in my -- I

4   -- I told them that I did not think from reading the

5   statements that I -- I couldn't find where there was

6   actual evidence -- I didn't think there was any

7   break-ins.

8       Q.    Did you ever determine, and we are still

9   talking about those previous burglaries, that anything

10  had been stolen from that residence?

11      A.    Mr. Wyatt reported a .22 pistol one time.    I

12  mean Mr. Searcy, excuse me.    A .22 rifle that belonged

13  to his father he said that had been stolen.

14            On another occasion he said $1,000 in hundred

15  dollar bills had been stolen.

16      Q.    And this is Mr. Searcy making these reports;

17  is that correct?

18      A.    Sir?

19      Q.    This is Mr. Searcy making these reports?

20      A.    Yes, sir.

21      Q.    Did Carl Wyatt ever make any report?

22      A.    No, sir, he just was there when it happened.

23      Q.    Did he ever state that anything to you that

24  anybody had stolen anything from him personally or

25  assaulted him?

1    A.    Not to me he didn't.  As -- I didn't actually

2  go to the burglaries.

3    Q.    But not to you, correct?

4    A.    Not to me he didn't.

5    Q.    Let me, Donny, take you to the statement you

6  took from the defendant on 6-11 of '99.

7    A.    Okay.

8    Q.    Okay.   On June 11 of last year, Donny, did

9  you re-interview the defendant?

10   A.    Yes, sir, I did.

11   Q.    Okay.   And without going through exactly

12 what you said, did you Mirandize him?

13   A.    Yes, sir, I did.

14   Q.    Would it be correct to say that what you read

15 into the record earlier and indicated that that was the

16 Miranda Warning, did you read the same warning to him?

17   A.    Same thing.  Yes, sir.

18   Q.    Did he appear to understand what you were

19 talking about?

20   A.    Yes, sir.

21   Q.    At that point did he appear to be intoxicated

22 in any way?

23   A.    No, sir.

24   Q.    Did you make him any promises or threaten him

25 in any way to get you to give him -- give you the

1    second statement?

2        A.    No, sir, I didn't.

3        Q.    Donny, did he change his story at all on 6-11

4    of '99?  Was there anything different?

5        A.    Yes, sir.  The -- after the first time I

6    interviewed him I had found out more about the path the

7    projectile took when it struck Mr. Searcy.  I had some

8    questions.  That's what I was asking him about.  And

9    at that time he told me he wasn't sure.  The first

10   time he gave me a statement he said he was sitting on

11   the couch.  This time he said he might have been

12   standing up.

13       Q.    Okay.

14       A.    He didn't -- he couldn't be sure if he was

15   standing or sitting.

16       Q.    So he wasn't quite as clear to where he was

17   seated or standing?

18       A.    No, sir.

19       Q.    Donny, would you turn to page 4 of the June

20   11 of 1999 statement?

21            MR. BOWERS:  Your Honor -- never mind.    I'm

22            sorry, Sam.

23            MR. PARTRIDGE:  That's okay.

24       Q.    Donny, the first question on page 4 of the

25   June 11 statement.  Could you read to the jury and

1  slowly so Carol can take it down from the first

2  question to the middle of page 5 which is the end of

3  the statement?

4      A.    First question on page 4 is:  Question

5  is, "Carl, when I interviewed you on June 2, 1999 I,

6  Lieutenant Nelson, asked you would it have made any

7  difference who came to the door when you shot Herman?"

8  And you replied, "No, I would have shot whoever came

9  through the door."

10         "Is this still true?"

11         Answer.    "Yes sir, it is."

12         Question.    "What if it had been a six-year

13  old child?"

14         Answer.    "It wouldn't have made any

15  difference, I would have still shot."

16         Question. "Why if someone had been breaking

17  in on you and Herman and robbing you, didn't you and

18  Herman stay sober so you could prevent this?"

19         Answer.  "We were both alcoholics.  We would

20  buy alcohol every day and couldn't help ourself.  We

21  couldn't stop drinking."

22         Page 5.    Question.    "Now that you have been

23  in jail for about ten days, do you realize you did

24  anything wrong?"

25         Answer.    "I thought Herman was asleep in the

1    bedroom.    I know I wouldn't have shot the person if I

2    had known it was Herman.    I realize I act recklessly

3    by not waiting to see who was coming in, but I was so

4    jumpy from the previous burglaries and I was also

5    intoxicated.    I just shot before I thought."

6        Q.    Okay.  Donny, so in this statement, the June

7    11 statement, he admits to you that once again he was

8    intoxicated, correct?

9        A.    Yes, sir.

10        Q.    He admits to you that he acted recklessly; is

11    that correct?

12        A.    Yes, sir.

13        Q.    And he also stated that if it had been a

14    six-year old child coming through the door it wouldn't

15    have made any reference; is that correct?

16        A.    Yes, sir, that's correct.

17            MR. PARTRIDGE:  Judge, that's going to be all

18                at this point.

19                CROSS EXAMINATION

20    BY MR. BOWERS:

21        Q.    Officer, Nelson.

22        A.    Yes, sir.

23        Q.    In the first statement that Mr. Wyatt gave to

24    you on June 2 you were reading his statement and then

25    Mr. Partridge asked you to skip on over to page 4 and

1    start reading again; was that correct?

2        A.    Just now?

3        Q.    Yes, sir.

4        A.    As best of my memory, yes, sir.

5        Q.    Okay.  Let's refer back to his statement of

6    June 2.

7        A.    Okay, sir.

8        Q.    You went through and you read the first

9    couple of pages.

10       A.    Yes, sir.

11       Q.    And then you skipped a question concerning

12   where you asked him about did he remember taking the

13   breath test; is that correct?  Bottom of page 3.

14       A.    I think --

15       Q.    You skipped that where you asked him did he

16   remember taking the breath test and he answered and you

17   told him why he hadn't took the breath test for your

18   safety and his.  And he responded that he remembered

19   taking that test; is that correct?

20       A.    Yes, sir.

21       Q.    All right.  And then there is a question

22   that follows that says, "Carl, had you or your friend,

23   Mr. Searcy, had any type of argument yesterday that

24   would have caused this shooting?"  And his answer is,

25   "No, sir."  Is that correct?

1        A.    Yes, sir, it is.

2        Q.    And then there is the question where

3   Mr. Partridge asked you to start back reading.  And the

4   question was, "Would it have made any difference who

5   came through the door?"  Is that correct?

6        A.    Yes, sir.

7        Q.    So you basically read the entire statement --

8   wait a minute.   I will rephrase that question.

9              And then on the last page of the statement

10  there is a question where you asked him but -- about

11  the door whether it was locked or unlocked; is that

12  correct?

13       A.    Yes, sir.

14       Q.    Okay.  Your question was, "But actually the

15  door wasn't locked and all Herman was doing was coming

16  in the house."  His answer, "That's correct."  You

17  said, "Anything else?"  He said,  "That's everything."

18  And that's the end of the statement?

19       A.    Yes, sir, it is.

20       Q.    Okay.  So when Mr. Partridge had you going

21  through the statement previously, you read the entire

22  statement except for the question you asked him about

23  whether or not he remembered taking the breath test?

24       A.    To the best of my memory, yes, sir.  I read

25  everything that Mr. Partridge asked me to read.  What

62

 1    he didn't ask me to read I didn't read.

 2         Q.   Yes, sir.  But that's what I'm asking you.

 3         A.   Yes, sir.

 4         Q.   You read the entire statement except for the

 5    question about whether or not he remembered taking the

 6    breath test; is that correct?

 7         A.   My answer is this.  To the best of my

 8    knowledge, yes, sir.  But I don't know if I read the

 9    whole complete statement.  I don't remember what all I

10    read.  I know I did not read that part you asked about,

11    yes, sir.

12         Q.   And then you did not read the question and

13    answer concerning whether or not there was -- whether

14    or not they had had an argument that would have caused

15    the shooting?

16         A.   No, sir, I did not.

17         Q.   Okay.  And then you did not read the

18    question as to whether or not the door was locked?

19         A.   No, sir, I did not.

20         Q.   Now are those three questions a part of that

21    statement?

22         A.   Yes, sir, they are.

23         Q.   And he responded to you concerning your

24    question had there been an argument?  Had he and

25    Mr. Searcy had any type of argument that would have

1   led -- that would have caused the shooting?  His

2   response was, "No, sir."

3       A.    That's correct.

4       Q.    Okay.  Now the second statement that

5   Mr. Partridge alluded to that was taken on June the 11;

6   is that correct?

7       A.    Yes, sir.

8       Q.    Did you read that entire statement?

9       A.    No, sir, I don't believe I did.   I do not

10  remember the exact things I left out.  I read

11  everything Mr. Partridge asked me to read.

12      Q.    Okay.   When was that statement given?

13      A.    It was 8:46 a.m. June 11.

14      Q.    Did -- your first question to Mr. Wyatt was,

15  "Carl, on June 2, '99 you gave me a statement at which

16  time you indicated that you were sitting on the sofa

17  and you were asleep in a sitting position.  You heard

18  the door open and you got the gun from under a cushion

19  on the couch you were sitting on and shot a person

20  standing in the doorway of the trailer; is that

21  correct?"

22          And what was his response?

23      A.    "Yes, sir."

24      Q.    And then your next question was, "And the gun

25  Officer McMichael showed you he got from Mr. Searcy's

1    car the night you shot him 6-1-99 -- the gun you shot

2    Mr. Searcy with."  And his response was what?

3         A.    "Yes, sir, it is."

4         Q.    And then you asked him, "How long did you and

5    Herman stay at the trailer where he was shot on Alpine

6    Drive before you drove him to the hospital?"

7              And his response was.

8         A.    "To the best of my recollection about 30

9    minutes."

10        Q.    And your next question was, "Why so long?"

11        A.    Yes, sir.

12        Q.    And his response was what?

13        A.    "Because Herman was refusing to go.  He said

14   he didn't have any insurance."

15        Q.    Insurance.   Is that the word you said?

16        A.    Yes, sir.

17        Q.    Okay.  And then your next question was, "Why

18   or what changed his mind?"

19              And his response was?

20        A.    "I finally convinced him he had to go because

21   a .22 was liable to go in any which way when it hits

22   you."

23        Q.    And then you next asked him, "Was the phone

24   working?"

25              And his response was?

1    A.    "Yes."

2    Q.    And you next asked him, "When Herman refused

3  why didn't you call an ambulance?"

4         And his response was?

5    A.    "I figured I could get him to go.    To tell

6  you the truth I didn't even think about it, calling an

7  ambulance."

8    Q.    And your next question was,  "Why didn't you

9  call us, the Sheriff's Department, and tell us that you

10  had shot him?"  Or Herman actually is what it says.

11        And his response was?

12   A.    "Same thing.   I didn't think about it. I was

13  just trying to get Herman to the hospital."

14   Q.    And then you asked him, "Are you sure you

15  were sitting on the couch and shot upward?"

16        And his response was.

17   A.    His answered was, "Not really.   I could have

18  actually been asleep, had the gun in my hand, jumped up

19  when Herman came in the door, and shot him while I was

20  standing up.   I do remember I was standing up when

21  Herman was inside the front door also standing up and

22  Herman said, 'You shot me.'"

23   Q.    And then I believe the next question is one

24  that Mr. Partridge has already asked you about.  "Also,

25  Carl, when I interviewed you, you asked if it made any

1    difference who came through the door when you shot

2    Herman and you replied, 'No, I would have shot whoever

3    came through the door because that's still true.'"

4            And his response was.

5        A.    "Yes sir, it is."

6        Q.    And then you again asked him whether it had

7    been a six-year old child and his response was?

8        A.    His response was, "It wouldn't have made any

9    difference, I still would have shot."

10       Q.    And then the rest -- the next two questions

11   are the ones that you had already read; is that

12   correct?

13       A.    Yes, sir.

14       Q.    And then would that be the end of the

15   statement then after that?

16       A.    Yes, sir, it would.

17       Q.    Okay.   No need to repeat those.

18            Now you in response to Mr. Partridge's

19   questions concerning the previous burglaries that were

20   reported that were alluded to in the statement.

21       A.    Yes, sir.

22       Q.    You said that you were aware of those

23   previous burglaries and that you investigated those

24   burglaries to some extent; is that correct?

25       A.    I didn't investigate the burglaries, I saw

1   the reports on the board.  I went to Mr. Searcy's house

2   to try to get some information maybe at the time other

3   burglaries -- they weren't able to question him on some

4   occasion.

5        Q.   So you weren't the officer who actually went

6   out and investigated those burglaries or alleged

7   burglaries; is that correct?

8        A.   The deputies, did, yes, sir.  I was just

9   trying to follow up a little bit on it.

10        Q.   But you were aware that reports had been

11   made; is that correct?

12        A.   Yes, sir.

13        Q.   And you said you saw the report; is that

14   correct?

15        A.   Yes, sir, I did.

16        Q.   And is it standard operating procedure in the

17   Autauga County Sheriff's Department that when someone

18   calls and makes a report about a burglary or any crime,

19   that y'all fill out some type of report on it so there

20   is a record of it?

21        A.   Yes, sir, it is.

22        Q.   Okay.  And then does the officer who took

23   that report usually start the investigation and then it

24   is turned over to someone else?

25        A.   He starts the investigation and goes as far

1    as he can with it, yes, sir.

2        Q.    All right.

3            MR. BOWERS:  I believe that's all, Your

4            Honor.    Thank you.

5                REDIRECT EXAMINATION

6    BY MR. PARTRIDGE:

7        Q.    Donny, to your knowledge, being an

8    investigator with the Autauga County Sheriff's

9    Department, was anybody ever arrested for those

10   burglaries?

11       A.    No, sir, there wasn't.

12       Q.    Over the course of your experience of being

13   an investigator, how many burglaries would you say you

14   have investigated in Autauga County?

15       A.    Hundreds.  It may be thousands.

16       Q.    And what would the frequency of arrest be

17   would you say, based on your experience, be in a

18   burglary?

19            MR. BOWERS:  Your Honor, I object.  It is

20            irrelevant.

21            THE COURT:  Sustained.

22       Q.    So the defendant, Carl Wyatt, never told you

23   that he was allegedly assaulted in any of these

24   burglaries; is that correct?

25       A.    He never told me, no, sir.

1      Q.    And the only person that you actually ever

2    talked to about these burglaries was Herman Searcy; is

3    that correct?

4      A.    Yes, sir.

5            MR. PARTRIDGE:  That's all.

6            MR. BOWERS:  No questions.

7            THE COURT:  Thank you.

8                        ADAM WADSWORTH

9            was sworn and testified as follows:

10                      DIRECT EXAMINATION

11   BY MR. JAMES:

12     Q.    Adam, how old are you?

13     A.    14.

14     Q.    Okay.  You know what it is to tell the truth;

15   is that right?

16     A.    Yes, sir.

17     Q.    Okay.  You understand you have to come in

18   here and tell the truth today; is that right?

19     A.    Yes, sir.

20     Q.    Okay.  And you agree to do that?

21     A.    Yes, sir.

22     Q.    All right.  Are you aware of a shooting that

23   happened to Mr. Searcy?

24     A.    Yes, sir.

25     Q.    Okay.  How do you know Mr. Searcy?

1      A.    My brother used to go down there all the time

2    and sometimes I would go with him and I just used to go

3    down there and talk to him sometimes.

4      Q.    Did you live around Mr. Searcy?

5      A.    I lived up on top of the hill.

6      Q.    He was close by; is that right?

7      A.    Yes, sir.

8      Q.    All right.   Do you know Carl Wyatt?

9      A.    Only met him a couple of times.

10     Q.    Okay.  Back around the time of this shooting,

11   did you know Carl Wyatt at that time?

12     A.    Just -- I only met him a couple of times.

13     Q.    Did you know who he was if you saw him?

14     A.    Yes, sir.

15     Q.    And you see him here today?

16     A.    Yes, sir.

17     Q.    Okay.  Where is he?

18     A.    Sitting right there.

19     Q.    The man in the orange; is that right?

20     A.    Yes, sir.

21     Q.    All right.   Now I want to take you back to

22   an event that happened about two weeks prior to when

23   Mr. Searcy got shot.

24     A.    Yes, sir.

25     Q.    Can you remember back to that time?

1    A.    Yes, sir.

2    Q.    Okay.  Was there a time about two weeks prior

3  when you saw Mr. Wyatt?

4    A.    Yes, sir.

5    Q.    Okay.  Where were you when you saw Mr. Wyatt?

6    A.    I was walking to my friend Troy's house.

7    Q.    Okay.  Walking down the road?

8    A.    Yes, sir.

9    Q.    Okay.  Where was Mr. Wyatt?

10    A.    Leaving his brother's house.

11    Q.    Okay.  Were y'all walking on the same side

12  or different sides?

13    A.    I was walking on the opposite.  I moved over.

14    Q.    Why did you move over?

15    A.    Because I didn't -- he was walking that way

16  and I just didn't want -- I knew he had a gun.  What I

17  was told.  And I got --

18        MR. BOWERS:  Objection, Your Honor, to

19              something he was told.

20        THE COURT:  Sustained.

21    Q.    Don't tell us what somebody else tells you.

22    A.    Yes, sir.

23    Q.    Just tell us what you saw.

24    A.    Yes, sir.

25    Q.    And you were walking down the road.  About

1    how far apart were y'all when you first noticed Mr.

2    Wyatt?

3        A.    I say probably here to the chalkboard or

4    something like that.

5        Q.    Okay.    Say 50 feet maybe?

6        A.    Yes, sir.

7        Q.    Okay.    Tell me what you saw as Mr. Wyatt

8    passed you?

9        A.    I was -- he had a bag in his hand and I was

10   walking passed --

11       Q.    Slow down a minute.    I'm not understanding

12   you.

13       A.    He had a bag in his hand.    I couldn't tell

14   what was in the bag and I saw his hand go toward his

15   back pocket.    And I got kind of nervous and I saw the

16   gun in his hand.

17       Q.    You saw a gun in his hand?

18       A.    Yes, sir.

19       Q.    Did he retrieve that from his back pocket?

20       A.    Yes, sir.

21       Q.    Okay.    What did he do with that -- what kind

22   of gun was it?

23       A.    Just a small handgun.    That's all I saw.

24       Q.    What did he do with that gun?

25            MR. BOWERS:    May we approach the bench, Your

1              Honor?

2       THE COURT:  I guess so.

3              (Bench conference, off record.)

4       THE COURT:  Ladies and gentlemen, I have an

5              objection that has come up that I have

6              got to ponder a few minutes.

7              There is no sense in making you sit

8              there while I'm doing it.

9                  Let me give you a fifteen-minute

10             break while I'm trying to sort this

11             question out that they have raised.

12                  (The Court admonished the jury.)

13                  (Jury not present.)

14      MR. BOWERS:  My objection, Your Honor, was

15             any further testimony from this witness

16             concerning prior acts would be

17             irrelevant in this case to show any type

18             of common plan or scheme or whatever

19             would be irrelevant in this case because

20             this is a reckless case.

21      THE COURT:  Okay.

22      MR. PARTRIDGE:  Judge, we will argue that it

23             does fall under an exception because we

24             can produce testimony that the defendant

25             was seen on more than one occasion

1  intoxicated and brandishing a firearm.
2  An element of this case is that we have
3  to prove that he acted recklessly and
4  show extreme indifference to human
5  life.  We feel like showing that he had
6  a gun, intoxicated on occasions within
7  just a couple of weeks of the actual
8  shooting does show a common scheme.
9  Him showing off the gun while he was
10  intoxicated.   And since we have to
11  prove reckless conduct, we feel like
12  these acts show that he was acting
13  recklessly for a short period up to the
14  actual shooting.
15  MR. BOWERS:  Your Honor, I again state
16  something that happened two or three
17  weeks prior to this event would be
18  irrelevant.
19  THE COURT:  Clearly the testimony that is
20  being offered falls within the general
21  exclusionary rule that evidence of prior
22  bad acts and wrongs are not admissible
23  to show that defendant acted in
24  conformity there with at the time in
25  question.

1                      However, such acts may be

2            admissible for other purposes which

3            include absence of mistake or accident

4            under 404(b).   Therefore, the testimony

5            would be admissible for that limited

6            purpose being an exception to the

7            general exclusionary rule.   Okay.

8                 (Recess.)

9                 (Jury present.)

10    Q.    Adam, just to recap where we are.

11          On this particular day about two weeks before

12  the shooting that you heard about, you had seen

13  Mr. Wyatt walking down the road; is that right?

14    A.    Yes, sir.

15    Q.    And I believe your testimony was that as you

16  approached him he was carrying a bag; is that right?

17    A.    Yes, sir.

18    Q.    Okay.   And at some point as you got closer

19  to him he reached behind his back?

20    A.    Yes, sir.

21    Q.    And he pulled out --

22    A.    A little handgun.

23    Q.    A handgun?

24    A.    Yes, sir.

25    Q.    Okay.   What did he do with the handgun?

1        A.    He just held it in his hand.  Very tightly

2   what it looked like.

3        Q.    And you guys, did you keep on walking?

4        A.    Yes, sir, I kept walking straight passed

5   him.  Didn't even look back.

6        Q.    Why didn't you look back?

7        A.    Because I was scared.

8        Q.    Okay.  You ever seen anybody who has had too

9   much to drink?

10       A.    Yes, sir.

11       Q.    Okay.  What do they look like?

12       A.    They cannot walk straight.  They just not

13  themselves.  Not like a regular person.

14       Q.    Did you notice anything unusual about the way

15  Mr. Wyatt was walking?

16       A.    Yes, sir.  I mean he wasn't walking straight

17  like if you are not drunk.

18       Q.    Okay.  Was there anybody on that road that

19  day other than you two?

20       A.    No, sir.

21       Q.    How old were you at the time of this event?

22       A.    How old was I?

23       Q.    Yes, sir.

24       A.    I was 13.

25       Q.    Okay.

1    MR. JAMES:  That's all I have, Judge.

2    MR. BOWERS:  No questions, Your Honor.

3    THE COURT:  Anything else?

4              Thank you, Adam.

5    MR. JAMES:  Melissa Wadsworth, Your Honor.

6                MELISSA WADSWORTH

7    was sworn and testified as follows:

8                DIRECT EXAMINATION

9    BY MR. JAMES:

10       Q.    Melissa, how old are you?

11       A.    Sixteen.

12       Q.    And do you know what it is to tell the truth?

13       A.    Yes.

14       Q.    And you know you have to tell the truth here

15    today; is that right?

16       A.    Yes, sir.

17       Q.    Is that what you are going to do?

18       A.    Yes.

19       Q.    Do you know Carl Wyatt?

20       A.    I have heard of him.  I don't know him know

21    him.

22       Q.    Okay.  Do you know him if you see him?

23       A.    Yes, sir.

24       Q.    Do you see him here in the courtroom today?

25       A.    Yes.

```
 1                    (Witness pointing.)

 2        Q.   Is that the man in orange?

 3        A.   Yes.

 4        Q.   All right.  Now you are aware of a shooting

 5   that occurred to Mr. Searcy; is that right?

 6        A.   Yes, sir.

 7        Q.   And I would like to take you back to an event

 8   that happened about two weeks or so prior to that

 9   shooting.  Do you remember that event?

10        A.   Yes.

11        Q.   Did that involve Mr. Wyatt?

12        A.   Yes.

13             MR. BOWERS:  Your Honor, I would have the

14                  same objection as with the previous

15                  witness.  Renew my objection.

16             THE COURT:  Objection overruled for reasons

17                  that I previously stated outside the

18                  presence of the jury.

19        Q.   Okay.   About two weeks before the shooting,

20   where did you have a chance to see Mr. Wyatt?

21        A.   On the side of the road.

22        Q.   On the side of the road.   Where was that

23   road?

24        A.   In Deatsville.

25        Q.   Okay.   About what time of day or night was
```

1    that?  Do you remember?

2        A.    It was after school sometime about probably

3    around four.   I don't remember.

4        Q.    Okay.   And if you could, how did you first

5    notice Mr. Wyatt?

6        A.    He was driving the car and he pulled over

7    beside me and my friends and started talking to us.

8        Q.    Okay.   At that time did he say anything to

9    you?

10       A.    He started talking about if anybody messed

11   with him he had something to protect him and we just

12   stood there and he pulled the gun from behind his back.

13       Q.    What kind of gun did he pull out?

14       A.    A small handgun.

15       Q.    Have you ever seen somebody that has been

16   drinking?

17       A.    Yes.

18       Q.    Okay.   You ever smelled alcohol?

19       A.    Yes.

20       Q.    Okay.   Could you tell if Mr. Wyatt had been

21   drinking that day?

22       A.    Yes.

23       Q.    How do you know that?

24       A.    He had about I think it was two bottles of

25   whiskey in the floorboard of the car that had been

1   opened.   And he smelled like it.

2        Q.    Okay.

3              MR. JAMES:   That's all I have, Judge.

4              MR. BOWERS:   No questions, Your Honor.

5              THE COURT:   Okay.

6              MR. PARTRIDGE:   Steve Searcy, Your Honor.

7                   I'm sorry, Judge.   That's Thomas

8                   Searcy.

9                        THOMAS SEARCY

10             was sworn and testified as follows:

11                      DIRECT EXAMINATION

12  BY MR. PARTRIDGE:

13        Q.    Could you state your name for the record,

14  please?

15        A.    I'm Tom Searcy.

16        Q.    Mr. Searcy, how old are you?

17        A.    61.

18        Q.    And where do you live?

19        A.    300 West Vanderbilt Loop, Montgomery.

20        Q.    Let me show you what is marked as State's

21  Exhibit Number 7.   Would you identify that for the

22  Court, please, sir?

23        A.    That is Herman C. Searcy, Jr., and that's my

24  brother.

25        Q.    Okay.   And how -- do you recall how old he

1  was at the time of this photo?

2      A.   Yes, sir.   He was 62.

3      Q.   And do you recall where this photo was taken?

4      A.   I don't know remember when the photo was

5  taken but I remember seeing that picture.

6      Q.   Mr. Searcy, where is your brother today?

7      A.   He is in Greenwood Cemetery.

8      Q.   So he is deceased?

9      A.   He is passed away, yes.

10         MR. PARTRIDGE:  Judge, at this time we move

11             to admit State's Exhibit Number 7.

12         MR. BOWERS:  No objection, Your Honor.

13         MR. PARTRIDGE:  That's all we have from this

14             witness, Judge.

15         THE COURT:  State's Exhibit 7 is admitted and

16             you are excused.

17             (State's Exhibit 7 was admitted in

18             evidence.)

19         MR. BOWERS:  I have no questions, Your

20             Honor.

21             (Bench conference, off record.)

22             CLARA JOY MARSHALL

23         was sworn and testified as follows:

24             DIRECT EXAMINATION

25  BY MR. PARTRIDGE:

1      Q.    Could you state your name for the record,

2   please?

3      A.    Clara Joy Marshall.

4      Q.    Ms. Marshall, how are you employed?

5      A.    Part-time with the Department of Forensic

6   Sciences.

7      Q.    And how long have you been part-time for the

8   Department of Forensic Sciences?

9      A.    This coming August will be three years.

10      Q.    Could you tell the jury briefly about what

11   your duties are with the Department of Forensic

12   Sciences?

13      A.    I transport -- I pick up, transport victims

14   or whatever from like funeral homes.  Pick them up out

15   of the hospital and take them to the facility for the

16   postmortem.

17      Q.    And the postmortem would be more commonly

18   known as an autopsy?

19      A.    Yes, sir.

20      Q.    Let me take you back to June 9 of 1999.  Did

21   you pick up the body of Herman Searcy on that day?

22      A.    Yes, sir.  Yes, sir.

23      Q.    And where did you pick that body up?

24      A.    Jackson's Hospital.

25      Q.    Is that in Montgomery, Alabama?

```
1          A.   Yes, sir.

2          Q.   Okay.  And where did you take that body?

3          A.   Forensic Sciences.

4          Q.   Which is located where?

5          A.   University Drive out there where Auburn is.

6          Q.   Okay.  Do you recall where you put the body

7     when you got it to the Department of Forensic Sciences?

8          A.   I weighed him in.  Put him in the cooler.

9          Q.   Okay.  And did you do anything with that

10    body besides transport it?

11         A.   No, sir.

12         Q.   Okay.

13         MR. PARTRIDGE:  That's all the questions I

14             have, Judge.

15         MR. BOWERS:  No questions, Your Honor.

16         THE COURT:  All right.

17                   May Ms. Marshall be

18             excused?

19         MR. PARTRIDGE:  Yes, sir.

20         THE COURT:  Thank you.

21                   Ladies and gentlemen, let's go on

22             and take our lunch break.

23             (The Court admonished the jury.)

24         THE COURT:  Be back at 1:30 and we will be

25             ready to start back.
```

1              We are moving along real

2         good.

3         (Lunch recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AFTERNOON SESSION

(Jury not present. Trial resumed.)

(1:35 p.m.)

THE COURT: When we broke for lunch, Mr. Will Jeffcoat, one of our jurors, indicated to the Court that when Mr. Tom Searcy testified that he realized or recalled that he knew him.

Will, if you will state for the record -- I had related to the attorneys I think what you told us. But let me get you to repeat it again in case I missed something.

JUROR JEFFCOAT: The church that I was born into, Highland Avenue Baptist Church in Montgomery, is where Mr. Searcy went to church. And we left that church, my whole family left that church when I was about seven or eight. The only reason I recognize Mr. Searcy is when he started speaking I remember him singing. But I haven't had any other dealings with Mr. Searcy since that time.

THE COURT: Do you feel like, Will, that that

```
1              knowledge or relationship would affect
2              your ability to be a fair and impartial
3              juror in this case?
4         JUROR JEFFCOAT:  No, sir, I don't believe
5              so.  I believe my duty as a citizen
6              overstates any kind of acquaintances.
7                   If it was a close family member or
8              something that way, yeah, I would have a
9              problem I believe so, but not at this
10             time.
11        THE COURT:  Thanks, Will.
12                  I will let you go back with Rick
13             and we will get the rest of the gang in
14             here in just a few minutes.
15                  That disclosure having been made by
16             Mr. Jeffcoat, does either the State or
17             the defense see a problem with him
18             continuing?
19        MR. PARTRIDGE:  No, Your Honor.
20        MR. BOWERS:  I don't, Your Honor.  It was a
21             minor witness in the grand scheme of the
22             case, and I have no problem with it.
23        THE COURT:  Okay.
24                  (Jury present.)
25        THE COURT: Ladies and gentlemen, when we
```

1    broke for lunch a while ago I instructed

2    y'all with regard to not discussing the

3    case and other matters.  Is there any

4    one who has been unable to comply with

5    those instructions?

6              (No response.)

7         THE COURT:  Okay.  Great.  We will pick back

8              up with the next State's witness.

9         MR. PARTRIDGE:   State would call Dr. Gregory

10             Wanger, sir.

11                   GREGORY WANGER

12    was sworn and testified as follows:

13                 DIRECT EXAMINATION

14   BY MR. PARTRIDGE:

15       Q.   Could you state your name for the record,

16   please, sir?

17       A.   Gregory Price Wanger.

18       Q.   Mr. Wanger, how are you employed?

19       A.   Currently employed as Assistant Chief Medical

20   Examiner and employed at the Roanoke office of the

21   office of the Chief Medical Examiner in Virginia.   I

22   cover the -- roughly the western third of the State of

23   Virginia, 17 cities.

24       Q.   Dr. Wanger, where were you residing as of

25   June of 1999?

1      A.   I was here in Montgomery.   I was employed as

2  a state medical examiner.   Our laboratory -- my

3  laboratory at that time was on University Boulevard at

4  the AUM campus.

5      Q.   And how long have you been a state medical

6  examiner?

7      A.   I first came to Alabama in 1988.   Employed

8  as state medical examiner.

9      Q.   So about 12 years?

10      A.   Roughly 11 or something.

11      Q.   Could you tell us a little bit about your

12  training, about your educational background?

13      A.   I received my medical degree from Ohio State

14  University in Columbus, Ohio.   Following that -- my

15  pathology training I was a pathology resident at the

16  same institution until 1983.   From 1983 to 1984 I was

17  a medical legal fellow with the Medical College of

18  Virginia in Richmond, Virginia.   During that time I was

19  also employed as a local metropolitan medical examiner

20  for Richmond.   Following that I was employed as

21  assistant chief medical examiner which I kept that

22  position until I moved to Alabama.   And then I just

23  recently returned in September of '99.   I returned to

24  Virginia.

25      Q.   Do you have any other special training

1    besides your formal education for example college,

2    medical school?  Do you have any other special

3    training?

4         A.    Well, the residency at Ohio State Hospital.

5    The fellowship at the Medical College of Virginia.

6    Following the completion of those extra studies, I took

7    a series of board examinations, anatomic, clinical, and

8    forensic pathology and passed those boards.  Those are

9    written tests based on projected slides, specimens, and

10   test questions for several days.

11        Q.    Okay.   How many forensic examinations would

12   you say you have performed over your career,

13   post-mortem exams?

14        A.    I have performed approximately 3,500

15   autopsies.

16        Q.    Okay.

17             MR. PARTRIDGE:  Judge, at this time we offer

18                  Dr. Wanger as an expert in the area of

19                  forensic pathology.

20             THE COURT:  All right.   He is accepted as

21                  such as he has been before.

22        Q.    Dr. Wanger, let me take you back to June 10

23   of 1999.   And let me show you what I have marked as

24   State's Exhibit Number 8.

25             Would you identify that document for the

1  jury, please, sir?

2        A.    Yes, sir, it is a copy of the autopsy report

3  and toxicology report.

4        Q.    And did you produce that report, sir?

5        A.    Yes, sir.  I did the autopsy report.

6        Q.    And does that appear to be an exact copy of

7  the report you produced?

8        A.    Yes, sir.

9        Q.    Could you tell the jury back in June of 1999

10 did you receive the body of Herman Searcy?

11       A.    Yes, sir.

12       Q.    And how did you identify that body, sir?

13       A.    At the time of my examination he had both a

14 toe tag and a body wristlet.

15       Q.    So you were examining the body of Herman

16 Searcy?

17       A.    Yes, sir.

18       Q.    Could you tell the jury a little bit about

19 what is involved in performing autopsies of course

20 without being too graphic?

21       A.    The autopsy examination begins with an

22 examination of the body surfaces for evidence of injury

23 or illness.   That's followed by a series of incisions

24 or cuts that are made in the body and then the internal

25 organs are removed and examined for evidence of injury

1  or illness.

2      Q.    And when you performed the autopsy on Herman

3  Searcy and you performed the external visual

4  examination, I guess palpable examination also, was

5  there any evidence of injury on Mr. Searcy's body?

6      A.    Yes, sir.

7      Q.    Could you tell the jury what that evidence of

8  injury was?

9      A.    There was a healing gunshot wound in the

10  upper right area of the abdomen.

11     Q.    And when you performed the internal

12  examination, did you determine whether or not damage

13  had been done to his body cavity by that gunshot wound?

14     A.    Yes, sir.  The projectile had gone across the

15  belly or abdomen towards the left going downward.   And

16  from right to left.   It had perforated a number of

17  places in the small bowel and the large bowel.   A

18  surgeon had made an incision and had removed a portion

19  of the small bowel and sewn it together.  So I could

20  see where the surgeon had sewn it together as well as

21  places where he had over sewn the holes and in the

22  small bowel and in the big bowel.

23     Q.    So there was evidence on Mr. Searcy of

24  surgical repair?

25     A.    That's correct.

1    Q.    Okay.  In further performance of your

2    autopsy, did you determine an exact cause of death?

3    A.    Yes, sir.

4    Q.    Could you tell the jury what the cause of

5    death was?

6    A.    Mr. Searcy, as a result of his gunshot wound

7    because he was so immobile from the surgery, had

8    developed clots in the lower part of his right lower

9    leg.  They are in very deep veins underneath the

10   muscles and in the muscles of his calf.  Some of those

11   had broken loose and had traveled to the arteries that

12   feed the lung and prevent the lungs from oxygenating

13   blood.  It is something that sits right in the center

14   of the pulmonary artery that feeds the lungs.  And it

15   obstructed the flow of blood into his lungs.  And

16   that's what he died from.

17   Q.    So could that be referred to as a pulmonary

18   embolism?

19   A.    That's correct.

20   Q.    And what would that pulmonary embolism be the

21   direct result of?

22   A.    It is because he was essentially shot and

23   been operated on and was not mobile and developed these

24   clots that broke loose.  So it was a result of the

25   gunshot wound.

1    Q.    So it is your testimony that the pulmonary

2  embolism was a direct result of him being immobile from

3  the gunshot wound?

4    A.    Yes sir.    It is one of the four common ways

5  that a gunshot wound can kill you.    If you are shot in

6  a vital center of the brain or the upper spinal cord,

7  that kills you.    If you are shot in a way that you

8  bleed to death before the surgeon can take care of you,

9  then you die from that bleeding.    If you develop an

10  infection from the wound you can die from an

11  infection.    And then lastly because of the pain

12  associated with the surgery and the results of the

13  surgery you may not be moving to develop clots that can

14  go to your lung.

15        So those are the four common ways that a

16  gunshot wound can kill you.    The last two just take

17  longer.

18    Q.    Okay.

19        MR. PARTRIDGE:  Judge, I believe that's all

20            at this point.

21        MR. BOWERS:  No questions.

22        THE COURT:  All right.    May Dr. Wanger be

23            excused?

24        MR. PARTRIDGE:  Dr. Wanger may be excused,

25            Your Honor.

1         THE COURT:  Thank you.

2         MR. PARTRIDGE:  Judge, I'm sorry.  I move to

3              admit the forensic report as State's

4              Exhibit Number 8.

5         MR. BOWERS:  No objection.

6         THE COURT:  All right.  It is admitted.

7                   (State's Exhibit 8 was admitted in

8                   evidence.)

9         MR. PARTRIDGE:  State would call Dr. Edward

10             Foxhall, Your Honor.

11                  DR. EDWARD FOXHALL

12        was sworn and testified as follows:

13                  DIRECT EXAMINATION

14   BY MR. PARTRIDGE:

15        Q.   Could you state your name, please, sir?

16        A.   Edward Neal Foxhall.

17        Q.   How are you employed, Mr. Foxhall?

18        A.   I'm a surgeon.

19        Q.   Okay.  And where are you employed?

20        A.   I would say I guess I'm self-employed for

21   Southeast Surgery.

22        Q.   And how long have you been employed in that

23   capacity?

24        A.   I have been a surgeon since 1990.

25        Q.   Could you tell the Court and the jury a

1    little bit about your background and about where you

2    went to school and what training you have received in

3    the area of general surgery?

4         A.    I was an honor graduate from the University

5    of Texas.    I started medical school in Mexico in

6    Guadalajara.    I finished at the University of Maryland

7    in Baltimore.    I did my surgery training in

8    Philadelphia, Pennsylvania.    And that's when I went to

9    Thomas Jefferson University Hospital.

10            Recently, I guess two or three years ago, I

11   spent an extra year at the University of Alabama in

12   Birmingham doing some extra training in laparoscopic

13   surgery.

14        Q.    And have you participated in any fellowships?

15        A.    The one at the University of Alabama would

16   be.

17        Q.    That was a fellowship.

18            Do you have any other special training?

19        A.    No.

20        Q.    Okay.    And over the course of your career as

21   a surgeon, how many surgeries would you say you have

22   performed?

23        A.    I couldn't count.

24        Q.    More than a 150 or 200 maybe?

25        A.    Per month.

1        Q.    Okay.

2              MR. PARTRIDGE:   Judge, we offer Dr. Foxhall

3                    as an expert in the area of general

4                    surgery.

5              THE COURT:   He is accepted as such.

6        Q.    Dr. Foxhall, let me take you back to June 1

7    of last year.   Do you remember treating a patient by

8    the name of Herman Searcy at the Jackson Hospital

9    Clinic?

10       A.    Yes.

11       Q.    Okay.   Could you tell the jury first of all

12   what injury Herman Searcy, what injury you treated on

13   Herman Searcy?

14       A.    He had a gunshot wound to the abdomen.

15       Q.    And at any point did you perform surgery on

16   Mr. Searcy?

17       A.    Yes, I did.

18       Q.    Could you tell the jury, I guess layman's

19   terms as best you could, exactly what you did in the

20   performance of the surgery and what damage was caused

21   by the gunshot wound?

22       A.    He was taken to the operating room where he

23   had what is called an exploratory laparotomy.   Where we

24   made a midline incision, opened his abdomen and

25   evaluated the amount of damage the bullet had done.

1    There were numerous holes in the small intestine and

2    another hole in the colon.   And some of the small

3    intestine was removed because it was damaged beyond

4    repair.   The areas that could be repaired were repaired

5    and sutured closed.   And also the colon was treated in

6    a similar fashion.

7        Q.    Dr. Foxhall, had that injury not been treated

8    would that injury -- would those injuries have been

9    sufficient to cause the death of Herman Searcy?

10       A.    Yes.

11       Q.    Going untreated of course.

12       A.    Going untreated.

13       Q.    After the operation, a few days after the

14   operation, did Herman Searcy develop any kind of

15   complications from this gunshot wound?

16       A.    Yes.   After the treatment of his gunshot

17   wound he developed delirium tremens, which is

18   withdrawal from alcohol.   And subsequently he had a

19   pulmonary embolus which I contribute to the cause of

20   his death.

21       Q.    Okay.   And what would be the cause of that

22   pulmonary embolus?

23       A.    The gunshot wound.

24       Q.    Okay.   And where is a pulmonary embolus or

25   where did this particular pulmonary embolus develop?

```
 1    Do you know?

 2         A.   I don't know for sure.  The most common place

 3    is in the large veins in the -- coming out of the legs.

 4         Q.   Okay.   And is this a traveling type of

 5    embolus?  Did it end up somewhere else in the body?

 6         A.   Yes.  It blocked off the blood flow to his

 7    lungs.

 8         Q.   And would that be sufficient to cause his

 9    death?

10         A.   Yes.

11         Q.   And it is your testimony that that is a

12    direct result of the gunshot wound?

13         A.   Yes.

14         Q.   Okay.  His body was then released to

15    Forensics Sciences?

16         A.   Yes.

17              MR. PARTRIDGE:   That's all, Your Honor.

18              MR. BOWERS:  No questions.

19              THE COURT:  May Dr. Foxhall be excused?

20              MR. PARTRIDGE:  Yes.

21              THE COURT:  Thank you.

22              MR. PARTRIDGE:  Judge, at this time the State

23                 rest.

24              MR. BOWERS:  May I approach, Your Honor?

25              THE COURT:  Yes.  We will see what we need to
```

1          do.

2                    (Bench conference, off record.)

3          MR. BOWERS:  I move for Motion of Judgment of

4               Acquittal and Motion to Dismiss on the

5               State's failure to prove a prima facie

6               case.

7                    That's all.

8          THE COURT:  Motion denied.

9                    Any witnesses for the defense?

10         MR. BOWERS:  Yes, sir, Your Honor.  I would

11              call Officer Lipscomb first.

12                    RONNIE NEAL LIPSCOMB

13         was sworn and testified as follows:

14                    DIRECT EXAMINATION

15    BY MR. BOWERS:

16         Q.   If you would state your full name, please,

17    sir.

18         A.   Ronnie Neal Lipscomb.

19         Q.   And where are you employed, please, sir?

20         A.   Autauga County Sheriff's Department.

21         Q.   I'm going to get you to speak up a little bit

22    you are looking at me instead of the jury.

23         A.   Autauga County Sheriff's Department.

24         Q.   And how long have you been employed there

25    with the sheriff's department?

1    A.    Full-time, almost two years.

2    Q.    Were you so employed with the Autauga County

3  sheriff Back in April of '99?

4    A.    Yes, I was.

5    Q.    All right.   And what are your duties with

6  the sheriff's department?

7    A.    We answer calls, write reports, serve civil

8  papers, and basically enforce the law to protect.

9    Q.    Back -- I'm going to get you to recall back

10  to April 21 of '99.

11        Did you have the occasion to receive a call

12  or respond to a call from a Herman Searcy?

13    A.    Yes, I did.

14    Q.    All right.  What type of call was that that

15  you received?

16    A.    It was a burglary and a theft of property.

17    Q.    All right.   Did you receive a call or did

18  you respond out to the location?

19    A.    I was dispatched out to the location by one

20  of the dispatchers.

21    Q.    Okay.  And what was the location where you

22  went?

23    A.    1744 Alpine Drive.

24    Q.    Deatsville, Alabama?

25    A.    Deatsville, Alabama.   Yes, sir.