1     Q.   All right.  And was that the home of

2  Mr. Herman Searcy?

3     A.   Yes, it was.

4     Q.   And what was the nature of that call?

5  Burglary and theft did you say?

6     A.   Yes.  They advised that somebody had forced

7  their way inside the residence and assaulted them and

8  stole some currency and left the scene after that.

9     Q.   Okay.  Now who advised that, please, sir?

10     A.   It was Herman Searcy and Carl Wyatt.

11     Q.   Did you interview both of them?

12     A.   Yes, I did.

13     Q.   And you said that -- I believe you stated

14  they were assaulted.  Who was it that was assaulted?

15     A.   From what the victims told me it was both

16  men, Carl Wyatt and Herman Searcy.

17     Q.   Okay.  And you said that they advised you

18  that some currency was taken; is that correct?

19     A.   Yes, sir.

20     Q.   And how much currency was taken?

21     A.   Eleven, one hundred dollar bills.

22     Q.   And did you make a report of that?

23     A.   Yes, I did.

24     Q.   And is that standard operating procedure with

25  your department to when you respond to a call to make a

1      Q.    And were there any arrests made concerning

2  this report?

3      A.    No, sir, it was none.

4      Q.    Okay.   Did you have the occasion to respond

5  to another call at this same residence?

6      A.    Yes, I did.

7      Q.    All right.   On May 1 of '99, did you have

8  the occasion to respond to a call or go to this same

9  residence?

10     A.    Yes, I did.

11     Q.    All right.   And was that at 1744 Alpine

12  Drive, Deatsville?

13     A.    Yes, it was.

14     Q.    Was it the same residence that you had gone

15  to before?

16     A.    Yes, it was.

17     Q.    And was that the residence again of

18  Mr. Herman Searcy?

19     A.    Yes, it was.

20     Q.    All right.   And what was the nature of that

21  call?

22     A.    Basically it is the same one.  It was a

23  burglary with an assault and a theft which was a .22

24  caliber rifle and the scope that was mounted on top of

25  it.

1      Q.    That was the items that were reported stolen?

2      A.    Yes, sir.

3      Q.    And who reported that stolen?

4      A.    Well, the rifle was stolen but the scope was

5  damaged.

6      Q.    Okay.   And who -- I believe you said someone

7  was assaulted?

8      A.    Yes.

9      Q.    Who was assaulted?

10      A.    Both individuals.   Both individuals reported

11  they were assaulted.

12      Q.    Did you see any signs of an assault, any --

13      A.    Yes, sir.   On this one I did.

14      Q.    All right.   What did you see?

15      A.    Mr. Searcy had several injuries to his face,

16  the rear head, his hands, and his knees.

17      Q.    What type of injury, please, sir?

18      A.    It was like somebody hit him with an object.

19      Q.    Like an abrasion or a bump?

20      A.    On his head.   That's the type injury.   I

21  think on his knees it was scrapes.

22      Q.    Scrapes.   Okay.

23             Did you gather any evidence at that time?

24      A.    Photographs.   And I believe -- that's just

25  the photographs.

1      Q.   Okay.   And did you -- did you gather any

2  statements at that time?

3      A.   No, sir, not on this one.

4      Q.   What was the -- what was the nature of the --

5  did they describe the break-in to you or the reason for

6  the call?

7      A.   The same as before.  Some unknown person come

8  in.  Almost identical to the previous calls except the

9  items taken were different.

10      Q.   All right.  And were any arrests made as a

11  result of this incident?

12      A.   No, sir.

13      Q.   And there again did you make a report in the

14  case?

15      A.   Yes, I did.

16      Q.   As you did before?

17      A.   Yes, I did.

18      Q.   All right.  And I'm sorry I may have asked

19  you this and I can't remember.  But was Mr. Carl Wyatt

20  there at that time?

21      A.   Yes, he was.

22      Q.   All right.  And was Mr. Carl Wyatt -- did

23  you see any signs of any physical injury on him?

24      A.   No, I did not.

25      Q.   Okay.  It was only on Mr. Searcy?

1          A.    Yes, sir.

2          Q.    Okay.    And back, the first incident in

3    April, April 21st, that incident, did you see any signs

4    of any physical injury at that time?

5          A.    Yes, I did.

6          Q.    On who?

7          A.    On Mr. Searcy.

8          Q.    On Mr. Searcy again.    What about Mr. Wyatt?

9          A.    No, sir, I didn't see any.    There was none

10   visible.

11         Q.    Yes, sir.

12               MR. BOWERS:    Thank you, sir.

13                        CROSS EXAMINATION

14   BY MR. PARTRIDGE:

15         Q.    Deputy Lipscomb, on each of these calls, did

16   you speak with Carl Wyatt or Herman Searcy or both?

17         A.    Mr. Wyatt.

18         Q.    Mr. Wyatt both times.

19               And I think you testified that on one of the

20   calls there was injury to Mr. Wyatt or just Mr. Searcy?

21         A.    Just Mr. Searcy.

22         Q.    On both --

23         A.    He reported that he was assaulted.    I was

24   going by what his statement was.    As far as any

25   visible injuries it was on Mr. Searcy.

1    Q.   As well as Mr. Searcy?

2    A.   Yes, sir.

3    Q.   Did Mr. Searcy do any talking?

4    A.   It was more of gestures as far as shaking his

5    head, nodding um-huh.  Mr. Wyatt would say, "Isn't

6    that how it went?"  And he would like nod.

7    Q.   But he didn't actually himself, Mr. Searcy,

8    articulate to you or tell you exactly what happened in

9    terms of the burglary or the assault?

10    A.   No, he did not.

11    Q.   Did Carl Wyatt ever identify this individual

12    to be a black male or a white male or female?

13    A.   He stated it was a white male.  But he could

14    not clearly identify the person.

15    Q.   And did you ever attempt to locate the gray

16    or white Nissan Toyota automobile?

17    A.   Yes.

18    Q.   Did you have any luck locating that vehicle?

19    A.   No, I didn't.

20    Q.   Okay.  Do you have an opinion as to who

21    assaulted Mr. Wyatt or actually they assaulted

22    Mr. Searcy?

23    A.   Not at this time.

24    Q.   Did Carl Wyatt ever ask you about recovering

25    his property or wanting to be reimbursed for example

1  for the hundred dollar bills that you can recall?

2      A.    No.

3            MR. PARTRIDGE:  Nothing further, Judge.

4            MR. BOWERS:  Your Honor, may this witness be

5                  excused?

6            THE COURT:  Certainly.

7            MR. BOWERS: `I call Mr. David Atteberry.

8                     DAVID ATTEBERRY

9            was sworn and testified as follows:

10                   DIRECT EXAMINATION

11  BY MR. BOWERS:

12      Q.    Officer, if you would state your name for us,

13  please.

14      A.    David Atteberry.

15      Q.    And if you would please, sir, I know I'm over

16  here, but when you respond if you will sort of face the

17  jury so that they can hear you.

18      A.    Yes, sir.

19      Q.    How long -- Mr. Atteberry, where are you

20  employed now?

21      A.    Autauga County Sheriff's Office.

22      Q.    And how long have you been with the sheriff's

23  department?

24      A.    About seven and a half years.

25      Q.    All right.   And were you so employed with

1  the Autauga County Sheriff's Department back in May of

2  '99?

3      A.   Yes, sir.

4      Q.   What are your duties, please, sir?

5      A.   Day-shift patrol sergeant.

6      Q.   All right.   And what are your duties?

7      A.   I supervise and I also respond to calls and

8  serve civil papers and patrol.

9      Q.   You respond to -- if someone called in with a

10 burglary or a theft or something, you would be one of

11 the officers who would respond to that?

12     A.   Yes, sir.

13     Q.   Did you have the occasion to respond to a

14 call from a Mr. Herman Searcy back on May 27, '99?

15     A.   Yes, I did.

16     Q.   Do you recall -- did you go out there?

17     A.   Yes, sir, I did.

18     Q.   Where did you go, please, sir?

19     A.   I went to Mr. Searcy's house at 1744 Alpine

20 Drive.

21     Q.   In Deatsville?

22     A.   Yes, sir.

23     Q.   And that was the home of Mr. Herman Searcy?

24     A.   Yes, sir.

25     Q.   And who was there when you got there?

1    A.    When I got there a neighbor, who I don't

2  recall his name, and Mr. Searcy.

3    Q.    Okay.    Was Mr. Carl Wyatt there when you got

4  there?

5    A.    No, sir.

6    Q.    All right.    And did you -- what was the

7  nature of the call, substance of the call?

8    A.    Mr. Searcy claimed that two white males had

9  entered his house about two o'clock that morning and

10  one of them hit him in the forehead with a metal bar

11  and turned some items over in the house looking for

12  something to steal.

13    Q.    Was anything taken that he could tell?

14    A.    Not that he could tell.

15    Q.    All right.    Did you gather any evidence at

16  that time?

17    A.    Yes, sir, I did.

18    Q.    What did you gather?

19    A.    Fire poker.

20    Q.    Okay.    And what did you do with the fire

21  poker?

22    A.    Sent it to Forensics to see if we could get

23  any fingerprints off of it.

24    Q.    And were they able to get any fingerprints?

25    A.    No, sir.

1       Q.    And you say you interviewed and talked to

2   Mr. Searcy at that time; is that correct?

3       A.    Yes, sir.

4       Q.    And did he have visible signs of injury,

5   physical injury to him?

6       A.    Yes, sir.

7       Q.    What were those signs?

8       A.    He had an open gash on his forehead.

9       Q.    And could you tell whether or not the house

10  had been gone through?

11      A.    The -- I recall that the sofa was turned

12  over.  With the condition of the rest of the house it

13  would not have been easy to tell.

14      Q.    Not the best house cleaners?

15      A.    No, sir.

16      Q.    But the sofa had been turned over?

17      A.    Yes, sir.

18      Q.    Okay.   Did you make a report of that

19  incident?

20      A.    Yes, sir.

21      Q.    Is that standard procedure for your office to

22  make a report when you are called out?

23      A.    Yes, sir.

24      Q.    And were any arrest made concerning that?

25      A.    No, sir.

1     Q.   Was there any damage -- were there any signs

2  of any damage to the home?

3     A.   Yes, sir.

4     Q.   What was that?

5     A.   Front door was off the hinges.

6     Q.   Okay.  And did Mr. Searcy relate to you or

7  were you able to determine from your investigation that

8  that was a result of the break-in or was that neglect

9  of the house?

10     A.   He told me that the door had been broken

11  in.  I could not tell if it happened that morning or

12  if it had happened previously.

13     Q.   But he told you that it had happened as a

14  result of this break-in?

15     A.   Yes, sir.

16     MR. BOWERS:  I believe that's all I have.

17                CROSS EXAMINATION

18  BY MR. PARTRIDGE:

19     Q.   Deputy Atteberry, you never made an arrest in

20  reference to this burglary did you?

21     A.   No, sir.

22     Q.   Did you ever determine where Carl Wyatt was

23  on that evening?

24     A.   Well, it was in the morning and at one point

25  Mr. Searcy and I went across the street and talked to

1    Carl Wyatt.

2        Q.    And what was he doing that evening?

3        A.    When we walked over there, I believe we

4    walked over there Mr. Wyatt walked out of the house and

5    we discussed what had happened with reference to his

6    call.

7        Q.    Did he have any independent knowledge, and I

8    am referring to Carl Wyatt, as to what happened in

9    reference to this call?

10        A.    No, sir.

11        Q.    So was he asleep at the time you went over

12    there?  Do you recall?

13        A.    He come out of the house before I got to the

14    door.

15        Q.    Did he appear to be intoxicated at the time,

16    based on your training and experience as a law

17    enforcement officer?

18        A.    Not that I recall.

19        Q.    And you could not determine whether or not

20    any property was stolen from the house, correct?

21        A.    No, sir.

22        Q.    Did you see any physical injuries on Carl

23    Wyatt when you went to his trailer to talk to him?

24        A.    He pointed out an injury he had received that

25    he said he had received at an earlier incident.    I

1    believe it was on one of his arms.

2        Q.    And why did you go to his trailer in the

3    first place?

4        A.    Mr. Searcy wanted to go over there.

5            MR. PARTRIDGE:  That's all, Judge.

6            MR. BOWERS:  That's all of this witness, Your

7                    Honor.  May he be excused?

8            THE COURT:  Certainly.

9            MR. BOWERS:  I call Mr. Carl Wyatt.

10                    CARL WYATT

11            was sworn and testified as follows:

12                    DIRECT EXAMINATION

13   BY MR. BOWERS:

14        Q.    Mr. Wyatt, can you hear me okay?

15        A.    Yes, sir, I can.

16        Q.    State your name, please, sir, for the

17   record.

18        A.    Carl Emmett Wyatt.

19        Q.    And I'm going to ask you like I have asked

20   everybody to, when you respond turn your head toward

21   the jury even though I'm over here.

22            How old are you, Mr. Wyatt?

23        A.    58.

24        Q.    All right.  Where do you live, please, sir,

25   or where did you live prior to this case?

```
 1        A.    Well, I was staying with Mr. Searcy up there

 2  but my brother lived on the hill just the other side of

 3  there at the 1759 Alpine Drive.   Which probably 200

 4  yards away.

 5        And Mr. Searcy asked me he was getting scared

 6  to stay over there by himself in the house over there.

 7  He had told me before I came there, you know, that

 8  people was breaking in and knocked windows out and

 9  stole stuff from him.  And so he asked me would I stay

10  with him.  I said I can't stay forever because I have

11  to work, you know, once in a while.

12        Q.    All right.  So right prior to this incident

13  you were living just up the street from Mr. Searcy?

14        A.    Right.    Right.

15        Q.    At 1750 something?

16        A.    1759.

17        Q.    Alpine Drive?

18        A.    Right.

19        Q.    And right shortly before this incident

20  occurred he asked you to come down and stay with him?

21        A.    Right.

22        Q.    All right.  How long had you been staying

23  with Mr. Searcy before this shooting took place?

24        A.    I would say off and on about almost three

25  months.
```

```
 1        Q.    All right.    How long have you known

 2   Mr. Searcy?

 3        A.    I have no -- it has been -- I have knowed him

 4   for years.

 5        Q.    For years?

 6        A.    Ever since he has lived there I guess.

 7        Q.    Would it have been more than five years?

 8        A.    Oh, yes.

 9        Q.    More than ten years?

10        A.    I think about eight probably.    That would be

11   more like it.

12        Q.    About eight years.    Is it safe to say that

13   y'all were friends?

14        A.    Right.

15        Q.    Were y'all good friends?

16        A.    I think so.    Back before he ever got his

17   check started, things like that, we went out and raked

18   up pine straw and picked up aluminum cans to get his

19   utilities paid.    I had an automobile back then.    I

20   didn't have anywhere to go at all.

21        Q.    Now about three months before this incident

22   occurred, he asked you to come down and stay with him

23   at his trailer; is that right?

24        A.    Right.    Right.

25        Q.    And why was that?
```

1    A.    He said -- he said people had been breaking

2    into his house and they stole his pants one night and

3    drivers license and everything.    And when he woke up

4    the next morning they were gone.    And my brother

5    carried him over here and got his drivers license

6    renewed.    They done it again.    I carried him the last

7    time.

8              MR. PARTRIDGE:    I object.    It is

9                   non-responsive.

10             THE COURT:    I forgot what the question was.

11             MR. BOWERS:    The question was why was he

12                  asked -- why did he ask him to come down

13                  there and stay with him and he responded

14                  to that, Your Honor.

15             THE COURT:    Okay.

16    A.    That's why he asked me to come stay with him

17    because he didn't want to stay there by himself at

18    night because it was about two or three o'clock is

19    usually when these people came by and broke in or

20    whatever they done.

21    Q.    How many times, if you know, about how many

22    times was Mr. Searcy broken into before you came to

23    live with him, if you know?

24    A.    Well, he got some checks stolen from him one

25    time before I came here.    I have been out of state in

1   Mississippi.    And he had some checks stolen from him

2   wrote on it.    And some few other articles stolen from

3   him.    I guess three or four times.

4        Q.    All right.    And then you came down to live

5   with him.    And you lived there with him about three

6   months prior to the shooting?

7        A.    Right.

8        Q.    During the time you lived there with him,

9   during the three months or so that you lived with him

10  --

11       A.    Um-huh.

12       Q.    -- were y'all broken into while you were

13  there with him?

14       A.    Um-huh.

15       Q.    I'm sorry.

16       A.    Yeah.

17       Q.    How many times, if you know, were y'all

18  broken into when you were living there with Mr. Searcy

19  at this 1744 Alpine Drive in Deatsville?

20       A.    Well, while I was there it has been three

21  times.    The first time is when they got the money.    I

22  didn't get to see -- I seen them when they left.    I

23  didn't get to them in time.    They went across the

24  hill.    One guy went across the hill.    And it was at

25  night about three o'clock in the morning.

1      Q.    Now is that the incident that Officer

2   Lipscomb referred to in April of '99?

3      A.    I guess so.  Because this here was June.

4      Q.    When he interviewed you and you gave a

5   statement that you saw somebody go over the hill and

6   get in a car, was that the incident?

7      A.    Right.

8      Q.    All right.  What is the next time?

9      A.    The next time is when that guy came in there

10  and he come, ease them latches open on the door of the

11  trailer and went back there and got Mr. Searcy's rifle

12  off his bed.  It was laying on the bed beside him and I

13  was laying on the couch asleep and he hit me on the top

14  of the head with that rifle and got and robbed me

15  laying there.  Okay?  He left and went out the door.

16  And then I got Mr. Searcy up and he came back.  And

17  forced me and Mr. Searcy back up in this little hallway

18  in the trailer there and started hitting him in the

19  head with the rifle, demanded money.  But we didn't

20  have none.

21     Q.    All right.  Would that have been the second

22  incident that Officer Lipscomb testified to?

23     A.    Right.

24     Q.    And was there another occasion?

25     A.    Well, the next one is when he tore the door

1    off the hinge.

2        Q.    All right.

3        A.    And I wasn't there at the time, I was over at

4    my brother's.

5        Q.    And is that the occasion then that Officer

6    Atteberry testified to that Mr. Searcy was hit in the

7    head?

8        A.    Well, he came over there to my brother's and

9    got me up and told me what happened.    And then about

10   that time Mr. Atteberry pulled in the driveway, my

11   brother's driveway, and they went back over to the

12   house.    And I told them I will be over there as soon as

13   I can get my shoes on.    I will be over there.    And I

14   went on over there and they tore the door completely

15   off the hinge.

16       Q.    But you weren't there on that occasion?

17       A.    I wasn't there then.

18       Q.    And I believe Officer Atteberry testified

19   that that happened on May 22 of '99; is that correct?

20       A.    Um-huh.    Thereabouts.

21       Q.    That being just a couple of weeks before the

22   shooting that we are here about right?

23       A.    About two weeks.

24       Q.    All right.    Between May 22 the time that the

25   door got torn off the hinges and the time and the

1  occasions when Mr. Searcy got shot, were y'all broken

2  in on any between them?

3      A.    No.

4      Q.    Okay.   All right.   Now, Mr. Wyatt, let's

5  come on up to June 1st, the day that Mr. Searcy got

6  shot, okay?  You recall that day?

7      A.    Um-huh.

8      Q.    I'm sorry.  You have to answer out yes or

9  no.

10     A.    Yes, I was there.

11     Q.    All right.   Had y'all been drinking that

12  day?

13     A.    Right.

14     Q.    All right.  Well, let me ask you though,

15  prior to that day, had you gone and gotten the pistol,

16  this pistol here?

17     A.    It was probably a couple of weeks before I

18  got that.   We didn't have no protection whatsoever and

19  they stole a rifle too.  We didn't have anything.  I

20  went and bought that and that's all.

21     Q.    Now is that the pistol that you are referring

22  to in your statement that you gave to Officer Nelson

23  that you went down and bought in Montgomery?

24     A.    That's right.  Right.

25     Q.    And did you carry that pistol with you?

1    A.    Right.

2    Q.    Because --

3    A.    Because after you get knocked in the head and

4    threatened with for your life, you know, it makes you

5    kind of -- kind of nervous walk around without

6    something there.

7    Q.    Yes, sir.   Now on June 1 of '99, were you

8    with -- were you staying with Mr. Searcy that day?

9    A.    Pardon me.

10    Q.    On June the 1st of '99, you stayed with

11    Mr. Searcy that day?

12    A.    Um-huh.

13    Q.    Is that a yes?

14    A.    Right.

15    Q.    All right now, Mr. Wyatt, I'm going to ask

16    you again now to answer out loud and face these people

17    over here, okay?

18    A.    Okay.

19    Q.    They are the ones that have to hear, not

20    me.   Okay?

21          Had you been with him all day that day?

22    A.    I was with him all night that night and all

23    day that day.   Because we got up about three o'clock

24    that morning and he came in there and turned the TV on

25    and we sat there and watched something on TV there

1  until about nine o'clock I guess that morning.  And so

2  he said something about cooking chicken or something or

3  another.  So we went down to brother's house and left

4  there and he wanted to go to Winn-Dixie.  So I went to

5  Winn-Dixie with him up to Millbrook and he got a

6  six-pack of beer up there at Winn-Dixie.

7      Q.   What time did y'all start drinking that day?

8      A.   Well, just about three o'clock I reckon when

9  we got up.

10      Q.   Three o'clock a.m.

11      A.   Um-huh.

12      Q.   In the morning?

13      A.   Three o'clock in the morning.

14      Q.   And did y'all basically drink all day?

15      A.   Well, practically.

16      Q.   After you went to Winn-Dixie and got some

17  beer at Winn-Dixie, what did you do?

18      A.   We came back to the house and I was fixing to

19  boil some chicken and rice and his brother called him,

20  Thomas called him.  And he told him about him going to

21  Winn-Dixie and everything.  Of course he called him

22  every once in a while.

23          And so it rocked on about eleven o'clock I

24  guess and about -- the mail carrier brought my check,

25  came to Mr. Searcy's mailbox.  I went down and got my

1  check out of the mailbox.  We came back and watched TV,

2  Price is Right or something.  I don't remember what it

3  was.  So Mr. Searcy said, "You want to go get that

4  check cashed?"  I said, "I will call the bank."  And

5  he called the bank where his bank was at and we went up

6  there and he said, "They told me that the lobby was

7  open until one o'clock."  It was 12:30 and we jumped in

8  the car and went up there.  And Mr. Searcy had to sign

9  my check because I didn't have no ID.  They done robbed

10  my ID and everything.  So I had to sign my check too.

11  And we cashed my check and went by the ABC store and I

12  picked up a fifth of Canadian whiskey and we went back

13  to the house and settled down there and --

14      Q.    Did y'all drink that Canadian whiskey?

15      A.    Right.  We drank it.

16      Q.    How much did you drink, the whole fifth?

17      A.    Practically all of it.  It was better part

18  of the day.  So I sat down -- I got to sleep sitting up

19  on the couch because a lot of times they come in there

20  and I wouldn't know it.  And after I put that new door

21  on the trailer where they tore that one off they had

22  springs on it where it slam that door back.

23      Q.    When did you replace the door on the trailer?

24      A.    When they tore that one off that was on

25  there.

1       Q.    Now was that the door that Officer Atteberry

2  was talking about?

3       A.    Right.  I replaced that door.

4       Q.    So sometimes between the end of May -- I mean

5  that incident of May 22 and June 1, you had replaced

6  the door?

7       A.    Right.  I replaced it that same day.

8       Q.    All right.  And how did you fix it?

9       A.    I bought some hinges up there at the

10  hardware, spring hinges.  And when you open it and turn

11  it loose it jerk it back and shut it.  A trailer door.

12  I put another trailer door on the house.

13       Q.    All right.  So now back on June 1 y'all had

14  been drinking and you had drank some Canadian whiskey

15  which -- you were sitting on the --

16       A.    I was sitting up.  When I went to sleep

17  Mr. Searcy went on back there to his room on back in

18  the back there and that's where he slept at.  And I got

19  up and told him,  "Don't come up on me without letting

20  me know that you are coming.  Because I may think it

21  is somebody in here and, you know, be shook up --" me

22  and him were scared to move around there.  Everything

23  moved on the outside.  We were, you know, run to the

24  window to see if there was somebody out there, you

25  know.  And so I don't know what happened.  Some how

1   or another he had gotten back up there where I went to

2   sleep at.  But he was undoubtedly coming in the house

3   when the door -- I heard the door slam, you know, the

4   spring jerked it back to.  It is dark inside that

5   trailer.  You can't see because a window had been

6   knocked out and the window been boarded up.  And so I

7   could see a kind of an outline of him when I -- when

8   the door slammed and I seen him.  That's when I -- my

9   gun was laying right here beside me on the couch.  And

10  I jumped up and fired and hit him in the side.

11      Q.   All right.  Now you stated you heard the

12  door slam.

13      A.   Yes.

14      Q.   And you looked up and all you saw was an

15  outline of a person?

16      A.   Right.  I knew it was somebody come in.  I

17  thought maybe somebody was breaking in on us again.

18      Q.   And you did not know who that was?

19      A.   No, I didn't.

20      Q.   And what you did you say you did?  I couldn't

21  hear you.

22      A.   I shot him.  When he come to the door I was

23  sitting up on the couch like this and I jumped up and

24  shot him.

25      Q.   Were you facing the door like straight ahead

128

1    or was it to the side?

2         A.    The door opens like this on the side.   See

3    the couch was along here.   And when the door slammed

4    back like this see I jumped up like this.

5         Q.    When you first heard the door slam, what did

6    you think was happening?

7         A.    I thought somebody was breaking in again.

8    That's what I thought.

9         Q.    Could you -- when you first woke up and

10   looked up, could you tell or see that it was Mr.

11   Searcy?

12        A.    No, I couldn't tell because it was dark in

13   there.

14        Q.    Where did you think Mr. Searcy was?

15        A.    I thought he was back in the back bedroom

16   back there asleep.

17        Q.    When did you realize that it was

18   Mr. Searcy --

19        A.    Mr. Searcy said, "Carl you shot me."   That's

20   what he said.   And then I realized then what had

21   happen.

22        Q.    What had happened to him?

23        A.    I went and looked and sure enough I had shot

24   him right through here.

25              All right.   He didn't want to come to the

1  doctor and go to the hospital.  I said, "Mr. Searcy, we

2  have to go to the hospital.  All there is to it."

3  Because a .22 is dangerous.  And he said, "I ain't got

4  no insurance."  I said, "We have to go to the

5  hospital."  We got in the car and I carried him to the

6  hospital up there.

7      Q.   How long was it probably -- how long a time,

8  if you know, was it before y'all went to the hospital?

9      A.   Approximately twenty minutes, thirty

10  minutes.  Something like that.  I don't know.

11      Q.   And during that twenty-minute time there, did

12  you call -- either one of y'all call the police?

13      A.   Nobody called them.  I just got him in the

14  car and brought him to the hospital.

15      Q.   Did y'all try to -- was he bleeding?

16      A.   No.

17      Q.   He wasn't bleeding very bad?

18      A.   No, none at all.

19      Q.   But you had to sort of convince him to go to

20  the hospital; is that what you are saying?

21      A.   Yes.

22      Q.   And you drove him to the hospital?

23      A.   Drove him to the hospital.

24      Q.   Did you stay there at the hospital with him?

25      A.   Stayed with him.

1    Q.   Stayed there with him?

2    A.   Right.

3    Q.   All right.  And were you still there when the

4  officers arrived?

5    A.   I was there when the officers arrived.  I

6  was there when the ambulance arrived and carried him to

7  Jackson Hospital and Herman Searcy reached out the back

8  door of that ambulance and got me by the hand and

9  wanted me to drive.  Said, "Come on go with me over

10  there."

11   Q.   But you didn't go?

12   A.   I said, "No, I have to stay here and see what

13  is going on here first."

14   Q.   Do you recall talking to Officer Nelson the

15  next day?

16   A.   Um-huh.

17   Q.   Is that a yes?

18   A.   Right.

19   Q.   All right.  And you recall giving a

20  statement to Officer Nelson the next day; is that

21  correct?

22   A.   Yes, sir.

23   Q.   All right.  And do you recall him asking you

24  if it would have made any difference to you who was

25  coming through the door?  Do you recall that?

1    A.    Yes, sir.

2    Q.    I believe his question, "Would it have made

3 any difference who came through the door when you shot

4 at Mr. Searcy or would you have shot any way or anyone

5 else?"  Do you recall that?

6    A.    It wouldn't have made any difference.  I was

7 startled you see and I --

8    Q.    Were you asleep, fully asleep right before it

9 happened?

10    A.    Fully asleep when that door slammed.

11    Q.    And did you just react?

12    A.    Just reacted just like somebody was coming

13 breaking in because I -- that's what I thought was

14 happening.

15    Q.    Were you sort of scared?

16    A.    Yes, I was.

17    Q.    Do you recall Officer Nelson asking you had

18 you and Mr. Searcy had any type of argument that day?

19    A.    Yes, sir.

20    Q.    Do you recall --

21    A.    Yes, sir.

22    Q.    Do you recall your answer?

23    A.    Yes, sir.

24    Q.    Which was what?

25    A.    We don't ever argue about anything.

1    Q.    Y'all had not had an argument or a fight that

2  day?

3    A.    No, sir.    No, sir.

4    Q.    Do you recall Officer Nelson asking you would

5  it have made any difference if it had been a small

6  child or six-year old girl, I believe is what he said,

7  go through the door?

8    A.    I remember him saying something to that

9  effect.

10    Q.    Do you recall what your answer was to that

11  question?

12    A.    Probably same answer because it wouldn't have

13  made any difference really because I was startled when

14  he opened -- when that door slammed I just reacted just

15  like that.

16    Q.    Also I believe -- do you recall talking with

17  Officer Jay McMichael at the hospital?  I believe he

18  might have been the first officer you talked to at the

19  office.

20    A.    There were several officers up there.  I

21  can't remember who all was up there I talked to.

22    Q.    Do you recall telling him -- I believe he

23  testified that you said you would have shot him again

24  if you had to?

25    A.    Well, I probably was saying if it had been

1    the same thing happened again I probably would have

2    said something like that.    I might -- I don't know if

3    I said that or not but that's --

4        Q.    You don't recall making that statement?

5        A.    No, I don't.    I really don't.

6        Q.    At the hospital, do you recall they were

7    asking you about the gun?  Do you recall that?

8        A.    They asked where it was at.    But I wasn't

9    really sure where it was at to tell you the truth.

10       Q.    You don't remember taking it with you?

11       A.    No, I wasn't sure where it was at.    Because

12   I was trying to get him to go to the hospital.

13       Q.    Were you trying to cooperate with the

14   officers there at the hospital as best you could?

15       A.    Yes.

16       Q.    You weren't trying to hide anything from

17   them?

18       A.    No.

19       Q.    You didn't try to run away from them in any

20   way, did you?

21       A.    No, I was waiting outside when they came.

22   As a matter of fact, that lady inside came and I signed

23   some papers, you know, at the hospital.

24       Q.    Yes, sir.

25       A.    And she said, "That officer in there is

1    looking for you."    And I went back in there and found

2    him.

3        Q.    Mr. Wyatt, on June 1 when you and Mr. Searcy

4    were together drinking, drinking your beer, drinking

5    the beer and I believe there might have been some

6    testimony that y'all drank some wine.    And you drank

7    the Canadian whiskey.    Did y'all do the drinking at

8    home?

9        A.    Biggest part of it.

10       Q.    All right.

11       A.    That's where we always went back home we

12   never --

13       Q.    Okay.  Had you fired the gun at any time that

14   day?

15       A.    I don't think so.    I have shot it a few

16   times at different things around there.

17       Q.    I'm talking that day on June 1.

18       A.    No, I don't think so.

19       Q.    On June 1 when you were awoken -- when you

20   woke up from the sleep by the sound of the door, the

21   noise that woke you up, did you know that it was

22   Mr. Searcy that had come through that door?

23       A.    No, I didn't know it was him that come

24   through that door.    I thought he was in the back room

25   asleep is what I thought.

```
1          Q.    Did you have any intention on June 1 to shoot

2     Mr. Searcy?

3          A.    No, sir.

4               MR. BOWERS:   I believe that's all I have.

5                       CROSS EXAMINATION

6     BY MR. PARTRIDGE:

7          Q.    Carl, you are telling this jury that you were

8     startled and that's why you shot Herman Searcy,

9     correct?

10         A.    Pardon me?

11         Q.    You are telling this jury that you were

12    startled and that's why you shot Herman Searcy?

13         A.    Right.

14         Q.    When you heard the door slam?

15         A.    Right.

16         Q.    You were drunk too, weren't you?

17         A.    Well, we drank practically every day, you

18    know, what I mean?  After a while you kind of, you

19    know, what is going on but you don't know what is going

20    on.  Do you know what I mean?

21         Q.    Were you drunk?

22         A.    No, I wasn't exactly drunk.

23         Q.    Do you remember taking the intoxilyzer test

24    at the Prattville Police Department?

25         A.    Oh, yes.
```

1      Q.    And you have been in here listening to this

2  testimony.    Do you recall what the results of that

3  test were?

4      A.    Yeah.

5      Q.    .15?

6      A.    Um-huh.

7      Q.    And do you recall that the legal standard for

8  intoxication in the State of Alabama when you are

9  operating an automobile is, .08?

10     A.    Um-huh.

11     Q.    So you were almost two times that standard;

12  is that right?

13     A.    That's right.

14     Q.    And you are telling this jury that you

15  weren't drunk?  Is that what you are telling them that

16  you were not drunk?

17     A.    I could operate a vehicle.

18     Q.    Carl, have you ever assaulted Herman Searcy

19  in the past?

20     A.    No.    Never.

21     Q.    Have you ever slapped him?

22     A.    No.

23     Q.    Have you ever hit him in any way?

24     A.    No.

25     Q.    Had he ever asked you to leave that trailer,

1    to get out?

2        A.    Um-huh.

3        Q.    And why is that?

4        A.    He just that way.  Sometimes he gets

5    something he wants to do he wants to be by himself and

6    he would say leave, and I will go down to my brother's

7    house and it won't be thirty minutes he will be back

8    down there to get me.

9        Q.    But you never slapped him or assaulted him?

10       A.    No.   Never.

11       Q.    Back on April 21 of 1999, when Deputy

12   Lipscomb came to your trailer.

13       A.    Um-huh.

14       Q.    That's the date that you were on the couch

15   and you are testifying that you got hit in the head,

16   right?

17           (Witness nods head.)

18       Q.    And you testified to this jury that they

19   wanted money but y'all didn't have any money; is that

20   right?

21       A.    Right.

22       Q.    Y'all didn't have any money that day?

23       A.    We had money in our socks.  We put money in

24   our socks.

25       Q.    Did they get any of that?

1    A.    They didn't get that.  They got my billfold.

2    Q.    Okay.  Let me show you this document I am

3  going to mark it as State's Exhibit Number 9.

4         Carl, do you read good?

5    A.    Yes.

6    Q.    Do you know what that is?  Read that to the

7  jury.  I covered up that part by accident.  But can

8  you read that top line?

9    A.    Alabama Uniform Incident Report.

10   Q.    Is that an incident report of what happened

11 on April 21?

12   A.    I would think so.

13   Q.    Okay.

14   A.    Herman Searcy signed it, didn't he, Theft of

15 Property?

16   Q.    Um-huh.

17   A.    All right.  That's probably --

18   Q.    And do you remember talking to Deputy

19 Lipscomb that day?

20   A.    Let's see.  Yes, this is before all this

21 other happened.

22   Q.    Okay.  Well, what is this report about?

23   A.    This is a report where his money was

24 missing.  This here is before any of that happened,

25 tearing the door off and all of that.

1    Q.    So this isn't the report when they hit you on

2  the head, this is a different report?

3    A.    Yeah.

4    Q.    Okay.  Well, let's see.  Would you start

5  reading right here the witness stated, "Mr. Wyatt

6  stated --"  go ahead and read right there.

7    A.    "Asleep on the couch in the living room."

8    Q.    Slow down a little bit if you could so the

9  jury can hear you and Mrs. Fain can take it down.

10    A.    This is the guy that took the money off of

11  Mr. Searcy in the back room and went across the hill

12  with it.

13    Q.    Okay.  And this is the guy that hit you in

14  the head on the couch?

15    A.    No, that's not the one that hit me in the

16  head.  This is a different time.

17    Q.    Okay.  Well, what you are saying in this --

18          MR. BOWERS:  Your Honor, may I approach

19              the bench please?

20    A.    That's a different --

21          THE COURT:  Hang on.

22              (Bench conference, off record.)

23    Q.    Did Herman Searcy have a job?  Did he work?

24    A.    Pardon me.

25    Q.    Did Herman Searcy have a job? Did he work?

1    A.    No.

2    Q.    What about you, did you have a job?

3    A.    Well, I have -- had been working in

4 Mississippi, with Mississippi State University,

5 Jackson.

6    Q.    Um-huh.

7    A.    And I think he is on social security.

8    Q.    You were drawing a check too, weren't you?

9    A.    Um-huh.

10    Q.    And how much was that check per month?

11    A.    $97, $96.

12    Q.    And back in between April and June of 1999,

13 were you working then or just using that check to live?

14    A.    Well, I do some painting for my sister over

15 there at the -- on Harper Street Apartments over there

16 from time to time.

17    Q.    Well, where did that $1,100 come from?

18    A.    He went to the bank and drawed it out and he

19 was going to buy a van with it.

20    Q.    Okay.   And that's the $1,100 that you

21 reported stolen on April 21?

22    A.    Right.

23    Q.    Okay.

24    A.    That's how much -- he didn't draw but $1,000

25 out but he had a 100 in his pocket or thereabout.   It

1    may have been more than that.

2        Q.   How many times did Herman Searcy ask you to

3    leave that trailer?

4        A.   Just one time.

5        Q.   Just one time?

6        A.   Yes.

7        Q.   And you didn't slap him or anything?

8        A.   Right.

9        Q.   You just left?

10       A.   Yes.

11       Q.   Were you upset about it?

12       A.   Well, nothing to be upset about.  He does it

13    a lot of times.

14       Q.   Did you argue?

15       A.   Sometimes he wants to be alone.

16       Q.   Did you argue?

17       A.   What are you going to do today or something

18    like that and I'm gone.

19       Q.   Let me ask you a question.  Did you argue

20    with him about it?

21       A.   No.

22       Q.   You just left?

23       A.   No.

24       Q.   Did you argue with anyone else about it?

25       A.   No.

1 Q. You just left that day?

2 A. Um-huh.

3 Q. Do you recall about when this was?

4 A. I don't know.  April, May, probably May.

5 Q. Did he ever ask you to leave in April?

6 A. May or April.  I can't recall.  Only one

7 time I remember.

8 Q. But --

9 A. His son-in-law came up there and he didn't

10 ask me then.  His son-in-law come up to the door.  I

11 was sitting on the couch and his son-in-law came over

12 there and said, "Mr. Searcy wants you to leave."  I

13 said all right and I left.  I went on across the road.

14 Q. And you didn't slap him on that day?

15 A. No.

16 Q. Okay.  Okay.  When you gave your first

17 statement to the police on the 2nd of June of last

18 year, you did tell them that it would make no

19 difference who came through that door.  Did you

20 carry -- when you got that pistol right there, did you

21 carry it with you all the time?

22 A. After we started getting broke into all the

23 time and I got threatened with my life looking down the

24 barrel of a rifle I carried it with me wherever I went.

25 Q. Did you carry it loaded?

1    A.    Loaded?

2    Q.    Um-huh.  Was it loaded?

3    A.    Yeah.

4    Q.    Did you keep a live round chamber under the

5    hammer or empty?

6    A.    Empty.

7    Q.    And that was for your own safety; is that

8    right?

9    A.    That's right.

10    Q.    You didn't want to shoot yourself in the leg,

11    did you?

12    A.    I sure didn't.

13    Q.    But someone opened the door and you just

14    raised up and shot?

15    A.    Somebody broke in on me that's the only way

16    to stop them.

17    Q.    And had you ever fired that gun before?

18    A.    Yeah.

19    Q.    Okay.  Where did you fire that gun before?

20    A.    I shot into some old refrigerators sitting

21    around there and buckets and things -- that thing won't

22    shoot it -- it ain't got enough power behind it.

23    Q.    Did you ever fire it before to scare off a

24    prowler?

25    A.    No.

1    Q.    No.    When you pointed the gun at the doorway

2  and saw the human form, did you say anything.    Did you

3  say, "Stop I have a gun I will shoot"?

4    A.    I didn't say nothing.

5    Q.    You just pulled the trigger, didn't you?

6    A.    That's right.

7    Q.    After drinking all night long?

8    A.    I had drank all day long.

9    Q.    All day long.

10        And you told the police that it didn't matter

11  who it was if it had been a six-year old child you

12  would have shot a six-year old child?

13    A.    I don't think there was a six-year old child

14  up in that country.

15    Q.    Did you ever show the gun to any teenagers in

16  the neighborhood?

17    A.    And you know why this had happened?

18    Q.    Let me ask you questions.

19        Who did you show it to?

20    A.    Them four or five of them girls.    One just

21  coming in here a while ago they run together up there

22  that lives on that back part.

23    Q.    Did you ever show them the gun?

24    A.    I sure did.    They stopped me up on the road.

25    Q.    Okay.

1        A.    Like that do me and Herman all the time.

2        Q.    Did you ever show a teenage boy a gun who was

3    riding the bicycle?

4        A.    Didn't ride no bicycle.

5        THE COURT:   Let's take a break.

6                       (The Court admonished the jury.)

7                       (Recess.)

8                       (Jury present.)

9        Q.    Carl, we were talking about you showing the

10    gun to some kids.   Do you remember that?

11       A.    Um-huh.

12       Q.    You admit you showed it to those kids?

13       A.    Um-huh.

14       Q.    Were you drinking at that time?

15       A.    I can't remember whether I was drinking at

16    that time or not.   I might have been -- I might have

17    had something to drink at that time.    But why I did

18    this I have a reason for this.

19       Q.    I just asked you that one question.   So you

20    don't know if you were drinking at that time?

21       A.    That's right.

22       Q.    How much do you drink?

23       A.    Well, back then I drank a good bit.   I drank

24    every day.   I can't remember how much.

25       Q.    And how long have you been drinking every

1  single day?

2      A.   Probably four or five months prior to that.

3      Q.   Did you feel like you had a problem with

4  drinking every day?

5      A.   I had a problem.  I have had two or three of

6  them.

7           MR. BOWERS:  Your Honor, may I?

8                Carl, take your hand away from your

9                mouth, please.

10     Q.   So you felt like you would have a problem

11  drinking every day?

12     A.   I did.  I went through a treatment.  I went

13  through two treatments, as a matter of fact.  VA sent

14  me to two treatments.  I stayed six months one time

15  and VA hospital in South Dakota.

16     Q.   So it would be fair to say that during those

17  five months leading up to the shooting you had alcohol

18  in your system pretty much every day; is that right?

19     A.   Pretty much.

20     Q.   But you still carried that loaded gun with

21  you?

22     A.   That's right.

23     Q.   When you got it after you carried it with you

24  every day?

25     A.   Right.

1    Q.    Now the day that you were asked to leave the

2    trailer back in March, do you remember if Herman had

3    any injuries on him that day?

4    A.    I wouldn't know.

5    Q.    Do you remember if he had a busted lip?

6    A.    I think that was before.    I think that was

7    before we got injuries on our hand and stuff.    I think

8    it was probably before then.

9    Q.    So you don't remember him having a busted lip

10    or anything that day?

11    A.    No.

12    Q.    Okay.    And did Herman ask you to leave or

13    did his uncle ask you to leave?

14    A.    He said it was his son-in-law.

15    Q.    His son-in-law?

16    A.    Um-huh.

17    Q.    Okay.    But he didn't ask you to leave?

18    A.    No.

19    Q.    Do you know why that is?    Was he scared of

20    you, Carl?

21    A.    I don't know.

22    Q.    You don't know?

23    A.    No.

24    Q.    So you are not saying he wasn't scared of

25    you.

1    A.    Well, I don't know.  I didn't even know what

2    the story was until the man come to the door and say

3    Mr. Searcy asked me to leave and I got up and left.

4    Q.    But you don't know whether or not Herman was

5    scared of you?

6    A.    No, I wouldn't think so.  I don't know why.

7    Q.    And these burglaries that allegedly happened,

8    did those happen?

9    A.    My opinion they did.

10    Q.    Your opinion they did.

11    Did you ever assault Herman and then say

12    someone had broken into the house?

13    A.    Never.

14    Q.    Why did you do all of the talking when the

15    police came?

16    A.    He would never talk about nothing.  I have

17    asked him, I said you know these people that are

18    breaking in here.  Why don't you tell somebody about

19    it one day they are going to come up here and I won't

20    be here.

21    Q.    But you would do all of the talking when the

22    police came?

23    A.    Most of the time -- they asked him -- one

24    time he told them everything.  I sat there and he asked

25    me did they take anything from me?  I said they took my

```
 1   billfold and my cards -- my ID and --

 2        Q.    Slow down and listen to the questions.

 3              And it is your testimony to this jury that

 4   you never assaulted him?

 5        A.    No, never.

 6        Q.    Except for when you shot him?

 7        A.    That would be the only time.

 8        Q.    And getting back to when you shot him.  Your

 9   testimony is that out of a dead sleep you stood up

10   aimed -- picked the gun up --

11        A.    That's right.

12        Q.    -- aimed it and fired it?

13        A.    I surely did.

14        Q.    And you admit in page 5 of your June 11

15   statement that that was reckless, didn't you?  Do you

16   remember that?

17        A.    Well, it could be called reckless.  Somebody

18   might call it reckless but you may never have woke up

19   with a gun pointed in your face either.

20        Q.    Read that line right there.

21        A.    I said yeah.

22        Q.    Will you read that for us, please, what you

23   said?

24        A.    "I realize I acted reckless by not waiting to

25   see who was coming in."
```

```
 1       Q.    Okay.  That's all.

 2       A.    I realize --

 3             MR. PARTRIDGE:  That's all, Judge.

 4             MR. BOWERS:  No further questions of this

 5                  witness, Your Honor.

 6             THE COURT:  Thank you, Mr. Wyatt, you may

 7                  step down.

 8             MR. BOWERS:  Your Honor, the defense has no

 9                  further witnesses.   We would rest.

10             THE COURT:  Anything further from the State?

11             MR. PARTRIDGE:  Yes, we have a rebuttal

12                  witness.

13             THE COURT:  Okay.   All right.  Go ahead.

14             MR. JAMES:  Donald Brackin, Your Honor.

15                       DONALD BRACKIN

16        was sworn and testified as follows:

17                    DIRECT EXAMINATION

18  BY MR. JAMES:

19        Q.    Mr. Brackin, state your name for the court,

20  please.

21        A.    Donald F. Brackin.

22        Q.    And where do you reside?

23        A.    Millbrook, Alabama.

24        Q.    Do you know Carl Wyatt?

25        A.    Yes, sir.
```

1    Q.   Did you know Herman Searcy?

2    A.   Yes, sir.

3    Q.   How did you know Mr. Searcy?

4    A.   He was my father-in-law.

5    Q.   How do you know Carl Wyatt?

6    A.   I met him at Herman's house.

7    Q.   Okay.   Had you met him more than once?

8    A.   Just two times.

9    Q.   Okay.   On April 16, 1999, did you have an

10   occasion to go to your father-in-law's house?

11   A.   Yes, I got -- yes.

12   Q.   Why did you go there?

13   A.   I got home from work that afternoon and there

14   was a message on my machine, Herman asking me to come

15   up there.

16        MR. BOWERS:   Your Honor, I object to anything

17             Herman said.   It will be hearsay.

18        THE COURT:   Okay.   Sustained.

19   Q.   Did you go to Herman Searcy's house?

20   A.   Yes, sir, I did.

21   Q.   What, if anything, did you observe while you

22   were there?

23   A.   When I got there Carl was inside and Herman

24   came outside and asked me to go in and ask --

25        MR. BOWERS:   Your Honor, again I object to

```
 1                    anything Herman said as to being

 2                    hearsay.

 3            THE COURT:  Sustained.

 4       Q.   Without telling us what anybody else said,

 5   tell us what you did on that day.

 6       A.   I walked into the trailer and asked Carl to

 7   leave the premises.

 8       Q.   Could you describe Carl's demeanor on that

 9   day?

10       A.   When I asked him to leave he was very irate,

11   and I would say he was pretty intoxicated at that time

12   also.

13       Q.   Anything unusual about your father-in-law's

14   appearance on that day?

15       A.   Yes, he had a big fat lip.

16            MR. JAMES:  That's all I have, Judge.

17            MR. BOWERS:  No questions, Your Honor.

18            THE COURT:  Okay.   Thank you.

19            MR. PARTRIDGE:  Can we approach, Judge?

20            THE COURT:  Sure.

21                 (Bench conference, off record.)

22            THE COURT:  Anything further from the State?

23            MR. PARTRIDGE:  No, sir, Your Honor.

24            THE COURT:  Ladies and gentlemen, that

25                    concludes all of the evidence in the
```

```
 1              case.
 2                   Since I gave us a longer break than
 3              I intended to a while ago, I know we
 4              have a few things that we need to take
 5              up outside of your presence, including I
 6              need to spend a few minutes with the
 7              lawyers and go over with them what I
 8              will tell you when we get to the Court's
 9              charge.
10                   So what we are going to do is I'm
11              going to try to get through that process
12              as quickly as possible and hopefully
13              within 15 minutes max we can be ready to
14              go into closing arguments and try to
15              finish up and go on and get the case to
16              you today and maybe we can finish it up
17              today if that will work.
18                   Things have moved along a little
19              quicker than I anticipated.  But let me
20              let you go back to the jury room
21                        (The Court admonished the jury.)
22                        (Jury not present.)
23         THE COURT:  At the close of all the evidence
24              does the defense wish to renew its
25              Motion for Judgment of Acquittal?
```

1        MR. BOWERS:  Yes, sir, Your Honor.

2     THE COURT:  Motion denied.

3             (Recess.)

4             (Jury present.)

5     THE COURT:  All right.   Ladies and

6        gentlemen, as I told you a few moments

7        ago all the evidence in the case has now

8        been presented to you and the final

9        thing that will happen is the lawyers

10       will have an opportunity to make their

11       closing arguments after which I will

12       give you the Court's charge.  As I told

13       you this morning when we begin, the

14       State will have an opportunity to speak

15       with you first, then the defense and

16       then the State has the final opportunity

17       to speak with you because they have the

18       burden of proof.

19            I remind you again that whatever

20       the lawyers say is not evidence.   The

21       evidence has come to you from this

22       witness stand and from these documents

23       and things that have been admitted.

24       And that and the law is what you will

25       base your decision on in this case.

1              Having made those remarks I will

2    turn it over to the lawyers now for

3    closing arguments.

4              (Closing argument by Mr. James.)

5              (Closing argument by Mr. Bowers.)

6              (Final argument by Mr. Partridge.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1
2                        JURY CHARGE
3          THE COURT:  Ladies and gentlemen, at this
4   stage of the case it becomes the Court's responsibility
5   or my responsibility to give you what I have referred
6   to as the Court's charge.   What it amounts to is the
7   legal standard that you will apply to the facts as
8   y'all find the facts to be in this case.
9          You know we say in this country that we have
10  a government of law and not of men, and that's what
11  this is really all about.
12          It doesn't make any difference what man or
13  what lady might be involved here, these same legal
14  standards apply.   It doesn't make any difference if
15  somebody is rich or poor or black, white, red, yellow,
16  whatever their station is in life, as long as juries
17  like you and courts like this continue to apply these
18  same legal standards, regardless of who is involved, I
19  submit to you that as long as we continue to do that,
20  that we will continue to have a government of law and
21  not of men.  And that's the true strength of your
22  justice system.
23          I have made some rulings on a few objections
24  throughout the trial of this case today.   I trust that
25  there hasn't been anything that I have said or done
```

1   that has been an indication to you that I had an

2   opinion about the facts.  I told y'all even before we

3   started yesterday that that was your job and I wasn't

4   going to get into it and I haven't and I'm sure not

5   about to now.

6          I also remind you as I have told you before,

7   that whatever the lawyers have said is not evidence and

8   you base your decision on the evidence that has come

9   from the witnesses as well as these documents in

10  addition to the law as I have given it to you.

11         Now this case comes to you by way of an

12  indictment.   And the indictment in this case reads as

13  follows:  The Grand Jury of Autauga County charge that

14  before the finding of this indictment Carl Emmett

15  Wyatt, whose true name is to the Grand Jury unknown

16  otherwise than as stated, did under circumstances

17  manifesting extreme indifference to human life he

18  recklessly engaged in conduct which creates a risk of

19  death to a person other than himself to wit:  Being

20  intoxicated, did fire a gun without first identifying

21  whom he was shooting at and did cause the death of

22  Herman Searcy in violation of Section 13A-6-2(a)(1),

23  Code of Alabama, 1975, against the peace and dignity of

24  the State of Alabama.

25         The indictment in this case charges the

1   offense of Reckless Murder.   And to that charge

2   Mr. Wyatt comes before you and says, I am not guilty.

3         Now one of those legal standards says that

4   the indictment in this case is not evidence.   An

5   indictment is simply the formal means or formal

6   mechanism by which a jury like you and a court like

7   this are brought together to make a determination on

8   these kinds of issues.

9         Something that is evidence and is to be

10  considered by you as such is the presumption of

11  innocence.   As we have discussed already this week,

12  you know in our country a person doesn't have to come

13  in here and prove to you that they are innocent, the

14  law says that for them.   And that presumption goes

15  with everybody, Mr. Wyatt here included, unless and

16  until the State proves to you beyond a reasonable doubt

17  each and every element necessary to constitute guilt.

18        Let's talk about that burden of proof of

19  beyond a reasonable doubt for a few minutes.

20        The term beyond a reasonable doubt or

21  reasonable doubt is like a lot of terms in the law that

22  addresses itself to your good common sense.   And a lot

23  of times, if not almost always, your good common sense

24  definitions of word and phrases are at least as good,

25  if not a lot better than some of these definitions that

1  we lawyers and judges use.

2          What is it, a reasonable doubt?  Simply a

3  doubt for which you have a reason.   A doubt for which

4  you can assign a reason that comes from the evidence or

5  the lack of evidence.

6          Another way of saying it is this.   If after

7  considering all of the evidence in the case you ask

8  yourself this question:  Is Mr. Wyatt guilty?  And if

9  the answer that freely and naturally flows back to you

10  is, I doubt that he is.   And if that doubt is based on

11  the evidence that has been presented to you or the lack

12  thereof, then the law says that that's the kind of case

13  that would entitle him to a finding of not guilty.

14          On the other hand, if after asking yourself

15  that same question:  Is Mr. Wyatt guilty?  If the

16  answer that freely and naturally flows back to you is:

17  I have no doubt for which I can assign a reason but

18  that he is, and if that is based on the evidence that

19  has been presented to you, then the law says that

20  that's the kind of case that would entitle the State to

21  a finding of guilt.

22          You know the State doesn't have to prove

23  guilt to you beyond all doubt.   They don't have to

24  prove guilt to a mathematical certainty.  But they must

25  prove guilt beyond that doubt for which there is a

1  reason.  Not one that you have to reach or strain or

2  grope for, but one that freely and naturally comes to

3  you.

4          It has been said that proof beyond a

5  reasonable doubt is proof of such a convincing

6  character that you would be willing to rely and act

7  upon it in the most important of your own affairs.

8          Now I read the indictment to you a minute ago

9  and that indictment charges the offense of Reckless

10  Murder.

11          Also included within that offense is what

12  they call a lesser included offense of Manslaughter.

13  A lesser included offense is defined as an offense

14  which contains some but not all of the elements of the

15  greater offense.   And just as Mr. Wyatt comes before

16  you and says I am not guilty on the Reckless Murder

17  charge likewise, he says I am not guilty on the

18  Manslaughter charge.   And therefore, it is incumbent

19  upon the State to prove the elements beyond a

20  reasonable doubt.

21          So let's talk about what the State is

22  required to prove beyond a reasonable doubt.

23          The Code of Alabama says that a person

24  commits the crime of Murder if under circumstances

25  manifesting extreme indifference to human life, he

1  recklessly engages in conduct which creates a grave

2  risk of death to a person other than himself and

3  thereby causing the death of another person.

4         The law says that what amounts to extreme

5  indifference depends on the circumstances of the

6  particular case.   But some shocking, outrageous, or

7  special heinousness must be shown.   Under

8  circumstances manifesting extreme indifference to human

9  life.

10         All right.   Recklessly engages in conduct

11  which creates a grave risk of death to another

12  person.   The term recklessly is defined this way.   A

13  person acts recklessly with respect to a result or to a

14  circumstance described by a statute defining an offense

15  when he is aware of and consciously disregards a

16  substantial and unjustifiable risk that the result will

17  occur or that the circumstance exist.   The risk must be

18  of such nature and degree that disregard thereof

19  constitutes a gross deviation from the standard of

20  conduct that a reasonable person would observe in the

21  situation.

22         I'm going to stop there and come back in a

23  second to where I am.

24         So what must the State prove to you beyond a

25  reasonable doubt in order to sustain the charge of

1  Reckless Murder?  These things:  That number one, the

2  defendant, Carl Emmett Wyatt; number two, under

3  circumstances manifesting extreme indifference to human

4  life; number three, recklessly engaged in conduct which

5  created a grave risk of death to another person; number

6  four, that that caused the death of Herman Searcy.

7           If after considering all of the evidence in

8  the case you find that the State has failed to prove

9  each of those elements beyond a reasonable doubt, then

10  you would consider whether the State has proven each

11  element of the Manslaughter charge.

12           The law of Alabama says that a person commits

13  the crime of Manslaughter if he recklessly causes the

14  death of another person.

15           In trying to work through this and think

16  about this today, I am always trying to see how to make

17  things simple so I can understand them.  That's why I

18  go one, two, three, four.

19           The difference in the element between

20  Reckless Murder and Manslaughter is that Reckless

21  Murder contains that additional element of extreme

22  indifference to human life.  Manslaughter has that

23  element of reckless.  Okay?  But does not have the

24  under circumstances exhibiting extreme indifference to

25  human life.

1       So now we are back to where I was reading to

2  you the definition of reckless.  Same definition.    But

3  that definition further goes on to say a person who

4  creates a risk but is unaware thereof solely by reason

5  of voluntary intoxication acts recklessly with respect

6  thereto.

7       The law provides that intoxication, whether

8  voluntary or involuntary, is admissible in evidence

9  whenever it is relevant to negate an element of the

10  offense charged.

11       It further says that when recklessness

12  establishes an element of the offense and the actor is

13  unaware of the risk because of voluntary intoxication,

14  his unawareness is immaterial in prosecution for that

15  offense.

16       So what must the State prove to you in order

17  to sustain the charge of Manslaughter?  These

18  elements:  Number one, the defendant, Carl Emmett

19  Wyatt; number two, recklessly; number three, caused the

20  death of Herman Searcy.

21       If after full and complete consideration of

22  all of the evidence in the case you find the State has

23  proven each of those elements beyond a reasonable

24  doubt, it would be your responsibility to find him

25  guilty.  If you find the State has failed to prove

1  each of those elements beyond a reasonable doubt, then

2  you would find him not guilty.

3          Next, ladies and gentlemen, I want to spend a

4  few minutes and talk to you about the evidence in the

5  case.

6          First of all of course it is up to y'all to

7  determine the weight and credibility that you wish to

8  place on a particular witness's testimony.   The law

9  says that you should first in your deliberations take

10 all of the evidence and testimony involved in the case

11 and put it altogether and try to reconcile it all with

12 the truth.

13         The law goes further than that and says that

14 if you find in your deliberations that there are

15 irreconcilable conflicts or differences in the evidence

16 and testimony, that it is within your province and your

17 province alone as a juror in this case, to accept the

18 part which you believe to be true and disregard the

19 part which you believe to be false.

20         Even within the testimony of a single witness

21 if you find that that witness has testified to you

22 falsely on any material point, you may either disregard

23 all of that witness's testimony or again accept the

24 part which you believe to be true and disregard the

25 part which you believe to be false.

Let me give you a few things to look to in helping you to determine the weight and credibility you wish to place on a witness's testimony.

First of all you want to look to see whether or not that witness actually had the ability to hear, see, or know what they told you. Did that witness have any special interest or bias or prejudice in the case? What was that witness's demeanor? Were they easy or uneasy, willing or unwilling? Demeanor is one of those big words that we use to describe something that you and I observe every day as we go through our lives. And you know how when you meet and talk to somebody you just get a good gut feeling from looking at them and talking to them as to whether they are shooting you straight. Same thing applies here.

Contrary to popular opinion sometimes, a courtroom is not one of those places where you leave your good common sense outside. We have 13 of you that have heard the evidence in this case, and in a few minutes 12 of you will go back to the jury room and decide. 12 different folks with different backgrounds and different experiences in life. I expect you to, and I know that you will, use your good common sense as you evaluate the testimony and determine the weight and credibility that you wish to place upon it.

1    You have heard testimony today with regard to

2    a statement that was given to law enforcement by

3    Mr. Wyatt.    The Court has made a determination and

4    admitted that statement into evidence.    You are to make

5    a determination of the voluntariness of that statement

6    as affecting the weight and credibility that you wish

7    to give it.

8    There have been a couple of people who have

9    come before you and testified as experts.    An expert

10   is a person who by way of special education,

11   experience, or training, has knowledge in areas that

12   most of us lay people don't.    And as such, they are

13   entitled to give an opinion.    Now just because

14   somebody is an expert doesn't mean that their testimony

15   is entitled to any more or less weight than anybody

16   else's.    You use the same standard in evaluating their

17   testimony as you do everybody else.

18   Now the defendant has taken the stand and

19   testified in this case which he has a perfect right to

20   do.    The law says that you can't just capriciously

21   disregard his testimony because he is the defendant.

22   But of course you can take that into consideration and

23   naturally he does have an interest in the outcome of

24   your verdict.

25   Like I said, in just a few minutes 12 of you

1  will go back to the jury room.    The first thing that

2  you will do when you get back there will be to select

3  one of your number to be the foreperson in this case.

4  That person will be responsible for leading and guiding

5  your deliberations and also will be responsible for

6  signing your verdict.

7            Now what are your possible verdicts in this

8  case?  Once again please don't attach any significance

9  in the order in which I read these or the fact that I

10  am giving it to you as indicating that I have an

11  opinion about the facts.    I have already talked about

12  that and this is just one of those things that falls in

13  my job.

14            If after a full and complete consideration of

15  the evidence in the case you find that the State has

16  proven to you beyond a reasonable doubt each and every

17  element necessary to constitute guilt with regards to

18  the charge of Reckless Murder, your verdict would be:

19  We, the jury, find the defendant, Carl Emmett Wyatt,

20  guilty of Reckless Murder as charged in the

21  indictment.    And then there is a place for your

22  foreperson to sign.

23            If you find the State has failed to prove

24  each of those elements beyond a reasonable doubt, then

25  you would consider the Manslaughter charge.

1    And if you feel the State has proven each of

2  those elements beyond a reasonable doubt your verdict

3  would be: We, the jury, find the defendant, Carl Emmett

4  Wyatt, guilty of Manslaughter as embraced in the

5  indictment.    And then a place for your foreperson to

6  sign.

7    Finally, if you find the State has failed to

8  prove each of those elements beyond a reasonable doubt,

9  your verdict would be:  We, the jury, find the

10  defendant not guilty.  And then there is a place for

11  your foreperson to sign.

12    Now your verdict in this case must be

13  unanimous.  That is it must be the verdict of each and

14  every one of you, both individually and collectively.

15    A number of y'all have been taking notes as

16  we have gone through the course of this trial.  And of

17  course I know you have noticed I do the same thing.  I

18  take notes because it helps me listen and also it helps

19  refresh my memory later.   You are entitled to rely on

20  your notes for those purposes.  However, you cannot use

21  those notes as being the authority of what the evidence

22  was.   You rely on the memory of all 12 of you because

23  12 of us is always a whole lot smarter than one.  And

24  that's what you rely on.

25    Finally, your verdict in this case can not

1    and must not be based on sympathy, passion, or

2    prejudice nor guesswork, speculation, or conjecture.

3    But it must be based on the evidence that has come

4    before you and on the law as I have given it to you.

5          Let me see if I covered what I indicated to

6    the attorneys that I would.

7          What says the State?

8          MR. PARTRIDGE:  Satisfied, Your Honor.

9          THE COURT:  What says the defense other

10              than --

11          MR. BOWERS:  I have an exception, Your Honor.

12          THE COURT:  Other than this we are okay with

13              it, Robert?

14          MR. BOWERS:  Other than my exceptions we are

15              okay.

16          THE COURT:  All right.  What we are going to

17              do is I need to find out who the

18              alternate is and who doesn't go back

19              there.

20                  After I identify the alternate the

21              alternate can stay in here with me for

22              just a few minutes.  The other 12 of you

23              can go to the jury room with Rick.

24              While y'all are doing that, we have a

25              couple of things that we need to do and

*Volume 2*

COURT OF CRIMINAL APPEALS NO._____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _____ AUTAUGA _____ COUNTY, ALABAMA

CIRCUIT COURT NO. ___ CC-99-322 ___

CIRCUIT JUDGE ___ JOHN B BUSH ___

Type of Conviction / Order Appealed From: ___ MURDER ___

Sentence Imposed: ___ 30 YEARS IN DOC ___

Defendant Indigent: [X] YES ☐ NO

CARL EMMETT WYATT

GARY A. C. BACKUS

(Appellant's Attorney)                    (Telephone No.)

P O BOX 1804

(Address)

MONTGOMERY, AL   36102-1804

(City)          (State)          (Zip Code)

NAME OF APPELLANT

V.

STATE OF ALABAMA

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

NAME OF APPELLEE

(For Court of Criminal Appeals Use Only)

1    when we finish that we will gather up

2    the exhibits.  They will come back to

3    the jury room with you and we will give

4    you the word to start your

5    deliberations.

6         Y'all can go ahead and be working

7    on getting a foreperson while we are

8    doing this.   But we will send you the

9    word when to start your deliberation.

10   Who doesn't go back?  Ms. Conger.   If

11   you will hang on just a second and I

12   will tell you what to do next.

13   Everybody else you can go with Rick and

14   we will send you the word in a few

15   minutes to start.

16         (Jury not present.)

17   THE COURT:  Okay.   Robert.

18   MR. BOWERS:  Your Honor, the exception I have

19        is that the Court did not give my

20        requested jury charge for Criminally

21        Negligent Homicide.

22   THE COURT:  Okay.   It is again denied.  Duly

23        noted.

24         (At 4:43 p.m the jury begin their

25         deliberations.)

```
 1                    (At 5:43 p.m. the jury returned to
 2               the courtroom and delivered a
 3               verdict as follows:)
 4      THE COURT:  Ladies and gentlemen, have y'all
 5           reached a verdict in this case?
 6      THE FOREPERSON:  We have.
 7      THE COURT:  If you will pass it to Rick,
 8           please, ma'am.
 9                    (Foreperson complies.)
10      THE COURT:  Ms. Barnes, if you would please
11           read the jury's verdict?
12      THE FOREPERSON:  We, the jury, find the
13           defendant, Carl Emmett Wyatt, guilty of
14           Reckless Murder as charged in the
15           indictment.
16      THE COURT:  If you will pass that back to
17           Rick, please, ma'am.
18                    What I would like to do is I want
19           to go through and ask each of you
20           whether this is your verdict.  And if
21           you will stay with me I will start at
22           this end and work my way back.
23                    (The Court polled the jury at this
24               time.)
25      THE COURT:  The record will reflect that the
```

1    Court has asked each juror whether this

2    is in fact their verdict and each has

3    responded that it is.  Therefore, ladies

4    and gentlemen, the Court will accept

5    your verdict and I will enter judgment

6    in accordance with it at the appropriate

7    time.

8         This will conclude your jury

9    service for this term of court.

10        (Jury not present.)

11    THE COURT:  Mr. Wyatt, I'm going to set

12    sentencing in your case for June the 14

13    at nine o'clock.  I have a sentencing

14    docket that day and we will try to get

15    word to the probation officer.  And if

16    they can get by to see you and have a

17    chance to have a report prepared by

18    then, hopefully we can do it on June

19    14.   If they are unable to complete the

20    report in time, we will do it the next

21    time and get it done.

22        Thank you, sir.

23        (Proceedings ended May 9, 2000 at

24        5:47 p.m.)

25

SENTENCING

(Prattville, Alabama- June 14,

2000, 9:51 a.m.)

THE COURT:  This is Case Number CC-99-322,

State of Alabama v. Carl Emmett Wyatt.

Mr. Wyatt is here this morning with

his lawyer Mr. Robert Bowers, Jr.  The

jury returned a verdict in this case

finding Mr. Wyatt guilty of Reckless

Murder at the conclusion of the trial,

on May 9, 2000.  We are here today for

sentencing in this case.

Mr. Bowers, have y'all had an

opportunity to review the report?

MR. BOWERS:  Yes, sir, Your Honor.  Mr. Wyatt

has read the report and he says that the

information in it is basically accurate.

THE COURT:  Mr. Wyatt, the Court having

accepted the jury's verdict finding you

guilty of murder, adjudicates you guilty

of murder.

Do you have anything to say now as

to why the sentence of the law should

not be imposed on you?

THE DEFENDANT:  I think I would like to

1    appeal --

2    THE COURT:  It isn't time for appealing yet.

3    I want to know if you want to say

4    anything before I sentence you?

5    THE DEFENDANT:  No.

6    THE COURT:  Mr. Partridge has provided the

7    Court with an amount requested in

8    restitution.  And provided defense with

9    a copy.  The total amount requested is

10   $39,211.44.  Which consist of Jackson's

11   Hospital Radiology Group, Alabama

12   Pathology, Prattville Fire and

13   Ambulance, Prattville Baptist Hospital,

14   Greenwood and Serenity Cemetery and

15   Leak-Memory Chapel.  Also with Dr.

16   Foxhall's charges.  That's what it

17   consist of all of those being expenses

18   related to the transport,

19   hospitalization, and burial of Mr.

20   Searcy in this case.

21   Robert, y'all got any additions to

22   the amount of restitution requested?

23   MR. BOWERS:  I don't, Your Honor.

24   THE COURT:  I don't find anything

25   unreasonable on there.  I think that is

1    all reasonable and also in line with the

2    type things that should be ordered by

3    way of restitution.

4        All right.  Mr. Wyatt, in this case

5    the Court sentences you to serve a term

6    of 30 years in the penitentiary.   I

7    order that you receive credit for time

8    served.

9        Further order that you pay court

10    cost, $100 Victim's Compensation Fund,

11    reimburse the State $1,000 to be applied

12    against Mr. Bowers' attorney fees, pay

13    restitution in the amount of $39,211.44

14    pursuant to the break down as provided

15    on the list which are attached to the

16    sentencing order.

17        Have you got any questions?

18    THE DEFENDANT:  No, sir.

19    THE COURT:  Okay.  You have a right to an

20        appeal.

21        Thank you, sir.

22        (All proceedings ended June 14,

23        2000 at 10:14 a.m.)

24

25

CERTIFICATE OF COMPLETION

REPORTER'S TRANSCRIPT

TO:   The Clerk of the Court of Criminal Appeals
         P.O. Box 301555
         Montgomery, AL  36130-1555

Criminal Appeals Case Number:  CR-99-1947

State of Alabama v. Carl Emmett Wyatt

On Appeal from the Circuit Court of Autauga County

Trial Court Case Number:  CC-99-322

Notice of Appeal Date:  6-19-00

        I, Carol K. Fain, certify that I have this date
completed and filed with the clerk of the trial court
an original and three copies of a true and correct
transcript of all proceedings in the above referenced
case that were reported by me and were specifically
designated by the appellant for inclusion on the
Reporter's Transcript Order. The transcript, which is
numbered serially in the upper right-hand corner of
each page, begins with a copy of the Reporter's
Transcript Order and an index of both the exhibits and
the testimony of the witnesses.  The original
transcript concludes with the original of this notice
and the copies of the transcript conclude with copies
of this notice.  The page number appearing in the upper
right-hand corner of this certificate is the last page
of my portion of the transcript in this case.

        Done this the 25th day of July, 2000.


                              Carol K. Fain
                              Court Reporter